HAWAIIAN TRUST COMPANY LIMITED, a Hawaii corporation, Trustee for the Creditors and Stockholders of Pacific Refiners, Limited, a dissolved Hawaii corporation, Appellant,

v.

UNITED STATES of America, Appellee.

No. 16859.

United States Court of Appeals Ninth Circuit.

May 25, 1961.

Marshall M. Goodsill, Honolulu, Hawaii, for appellant.

Charles K. Rice, Asst. U. S. Atty. Gen., Lee A. Jackson, A. F. Prescott, Joseph Kovner and Sharon L. King, Attys., Dept. of Justice, Washington, D. C., and Louis B. Blissard, U. S. Atty., Honolulu, Hawaii, for appellee.

Before HAMLIN and MERRILL, Circuit Judges, and JAMESON, District Judge.

JAMESON, District Judge.

Appellant taxpayer seeks recovery of federal income taxes paid under protest for the years 1953 and 1955. Appellant is trustee for the creditors and stockholders of Pacific Refiners, Ltd., a dissolved corporation, hereinafter referred to as Refiners. Two questions are presented: (1) whether Refiners was entitled to carry forward as a consolidated net operating loss to 1953 the net operating loss suffered in 1950 by its subsidiary, Hilo Gas Company, Ltd., hereinafter referred to as Hilo Gas; and (2) whether Refiners was entitled to deduct in 1955 Territory of Hawaii income taxes allocable to capital gains from sales in liquidation of Refiners, the gain not being recognized for federal income tax purposes by reason of Section 337, Internal Revenue Code of 1954, 26 U.S.C. § 337. Both questions were decided adversely to appellant by the trial court. See 178 F.Supp. 637. The case was submitted on an agreed statement of facts.

*Was Taxpayer Entitled to Deduct Loss Carry-over in 1953 Consolidated Return?*

The facts pertinent to a determination of the first issue may be summarized as follows:

Refiners, a corporation organized under the laws of Hawaii on May 31, 1949, and dissolved on November 19, 1956, was engaged in the manufacture and sale of petroleum products and the distribution of butane in Hawaii. It was not a public utility and none of its business was subject to regulation by the Public Utility Commission of Hawaii. Honolulu Gas Company, Ltd., hereinafter referred to as Honolulu Gas, was a public utility operating a manufacturing gas business in Oahu. Subsequent to the incorporation of Refiners, Honolulu Gas purchased its gas from Refiners. The initial stock issue of Refiners was purchased by Honolulu Gas and distributed to its stockholders as a dividend. Hilo Gas, organized in 1927, was engaged as a public utility in the manufacture and distribution of gas in the City of Hilo and in the non-utility business of distributing bottled liquefied petroleum gas outside of the city.

In August, 1949, Refiners entered into a contract with Standard Oil Company of California, hereinafter called Standard, for the purchase of petroleum oil and butane for a period of ten years, the contract specifying a substantial minimum purchase each year. Standard supplied Refiners a heavy gas oil blended with butane. Refiners separated the butane from the gas oil at its refinery. The liquefied butane was stored and sold by Refiners. The gas oil was sold to Honolulu Gas for its use in the manufacture of gas.

In 1948 and 1949 Hilo Gas lost money and was in financial difficulties. In the spring of 1950, Orlando Lyman, its president and largest stockholder, approached A. E. Englebright, the general manager

of Refiners, for assistance in solving the problems of Hilo Gas. It was first proposed that Hilo Gas should cease the manufacture of gas and buy butane from Refiners, thus saving manufacturing costs. Further negotiations, in which alternative plans were considered, proved unsuccessful.

About the middle of September, 1950, Lyman offered to sell his shares of Hilo Gas to Refiners or Honolulu Gas. With his stock and that of another stockholder who was willing to sell, Refiners could acquire in excess of 75% of Hilo's stock. On October 3, 1950, Refiners secured options to purchase 84% of the stock of Hilo Gas. The purchase was consummated October 6, 1950, and by October 25, 1950, Refiners had acquired 96% of the stock of Hilo Gas at a total cost of $63,897.20.

On September 27, 1950, the directors of Honolulu Gas authorized the acquisition of the assets of Hilo Gas at a price not to exceed $75,000.00, subject to the approval of the Public Utilities Commission. On October 20, 1950, Hilo Gas filed a petition with the Public Utilities Commission for approval to sell its assets to Honolulu Gas. The Commission entered an order on November 15, 1950, approving the sale for approximately $64,000.-00, $46,000.00 in cash and the balance through the assumption by Honolulu of the liabilities of Hilo. Under Hawaiian law, the sale of substantially all the property of a corporation required the affirmative vote of three-fourths of the stock. On October 31, 1950, Hilo Gas (with Refiners holding more than three-fourths of the stock) authorized the sale of the utility assets to Honolulu Gas, and the sale to Refiners of the other assets for $18,500.00. Hilo Gas retained merchandise parts inventory amounting to

$1,010.64, certain accounts receivable, and the lease of an office building in Hilo.[1]

The stock of Hilo Gas was purchased by Refiners, rather than by Honolulu Gas, because Refiners as the distributor of butane had the primary interest in securing the Hilo market. Honolulu Gas was interested in the utility business of distributing gas through the city mains, but was not interested in the distribution of bottled butane. In addition, an order of the Public Utilities Commission would have been necessary before Honolulu Gas could purchase the stock, whereas no such order was required in the case of Refiners; and in the view of Refiners' management, quick action was necessary. Moreover, the purchase of Hilo Gas stock by Honolulu Gas would have made it a public utility holding company under federal law, a situation which Honolulu Gas wished to avoid.

On October 31, 1950, Hilo Gas sold assets having a basis for tax purposes of $211,684.90 to Honolulu Gas and Refiners for a total consideration of $88,754.32. The utility assets were sold to Honolulu Gas for $122,930.58 less than their net book value. The utility assets consisted of "property used in the trade or business" as defined in Section 117(j) (1), Internal Revenue Code of 1939, 26 U.S.C. § 117(j) (1). As a result of the sale of the utility assets to Honolulu for $122,-930.58 less than their net book value, Hilo Gas claimed a net operating loss of $117,-792.50 for 1950.

The tax year of both Refiners and Hilo Gas was the calendar year. Consolidated federal income tax returns were filed for 1950, 1951, 1952, and 1953,[2] and separate returns for 1954 and 1955. Both companies filed separate territorial income tax

---

1. On December 31, 1950, the balance sheet of Hilo Gas showed assets as follows: cash in bank—$14,498.76; notes receivable (taxpayer—1% interest) $50,000.00; accounts receivable (other) $531.30; inventory—$904.60; total—$65,934.65; and accounts payable of $647.97 and other current and accrued liabilities of $106.-80, or total current liabilities of $754.77.

returns for the years 1950 to 1955 inclusive.

In 1950 Refiners suffered a loss of $93,-092.00. In 1951 it had a net income of $17,445.00 and in 1952, $39,147.00. It did not have to pay any federal income taxes in those years. In 1953 it had a net income before income taxes of $206,-397.20 and after income taxes (as reported) of $167,229.00. In 1954 it had a net income before income taxes of $215,735.-66 and after income taxes (as reported) of $104,977.00. These figures are on an unconsolidated basis.

The original plan of Refiners as controlling stockholder of Hilo Gas had been to sell the utility assets to Honolulu Gas and dissolve Hilo Gas at such a time as the directors determined to be convenient. Actually, Hilo Gas did not sell and distribute all its assets in 1950 and continued its corporate existence until September 18, 1956, when it was dissolved.

From 1950 until its dissolution, Hilo Gas continued to file the annual reports required by Hawaiian law, hold meetings of stockholders and directors, and file federal and territorial income tax returns. While other possible uses of Hilo Gas were considered, its specific activities during this period consisted of leasing property, which it sublet to Honolulu Gas and to the taxpayer. Hilo Gas received rental, interest and merchandising income and paid expenses for office supplies, janitor service, directors' fees, pensions to retired employees and federal and territorial taxes.

Corporation exhibits filed by Hilo Gas as required by territorial law show total income of $19,294.16 in 1951, expenses of $18,324.96, for a net income before taxes of $969.20. Comparable figures for succeeding years were: 1952, $10,732.76, less $10,273.26, for a net income of $469.-50; 1953, $8,600.00, less $5,830.71, for a net income of $2,769.29; 1954, $8,600.00, less $6,009.25, for a net income of $2,-590.75; 1955, $8,700.00, less $6,063.04, for a net income of $2,636.96.

At the time of the acquisition of the stock of Messrs. Lyman and Hutchinson on October 6, 1950, no consideration was given by Refiners to the tax aspects of the transaction. The officials of Refiners did not know what the book value of the Hilo Gas assets was, and the Hilo Gas books were not made available to Refiners until after the decision had been made to purchase the Lyman and Hutchinson stock. Mr. Lyman has stated that the principal purpose on taking over Hilo Gas was to sell butane not then used by Hilo Gas.[3]

In November, 1950, Refiners obtained advice on the tax aspects of the transaction and was advised that the book loss on the sale to Honolulu Gas would be an allowable deduction in a consolidated return filed by Refiners and Hilo Gas, but that this would not be an immediate benefit because Refiners did not have any net income. Honolulu Gas was advised that it could not acquire the Hilo Gas assets at their book value in order to take advantage of the loss sustained on the abandonment of the manufacturing plant.

The net loss from the sale in October, 1950, of the utility assets of Hilo Gas to Honolulu Gas was included in computing

---

3. This pargaraph is taken verbatim from Stipulation of Fact XVI. In view of the importance of this stipulation to a determination of the first issue, the balance of the stipulation is quoted, as follows:

" 'As far as I know, no investigation was made into the accumulated losses of Hilo Gas or was the matter discussed at any time between Mr. Englebright and myself during the negotiations. The purpose of the purchase of Hilo Gas Co. was to do away with the old manufactured gas plant and replace it with butane shipped in from Pacific Refiners.' " (Letter of August 27, 1956.)

" 'Mr. Englebright and I at no time discussed the book value of the assets of Hilo Gas Company.

" 'It is also my recollection that your accounting staff did not arrive in Hilo until the day I left the company after the sale. This timing I recollect, as pay for my vacation time was left up to your staff. They refused payment. This incident, I believe, helps to place the correct timing of your accountant's access to the books. Mr. Englebright did not look over the books at any time before the purchase.' (Letter of September 17, 1956.)"

the net operating loss carry-over to subsequent years,[4] in the consolidated income tax returns timely filed for Refiners and Hilo Gas. The Commissioner of Internal Revenue disallowed this item, resulting in a deficiency for the year 1953 of $58,472.39, plus interest of $11,301.-99, which taxpayer has paid and is suing to recover.[5]

The trial court held that the Commissioner's disallowance of the "loss carry-over" was correct, but sustained the disallowance on the ground that the taxpayer "has not established that 'the principal purpose for' the acquisition of Hilo Gas was not for 'evasion or avoidance of Federal income * * * tax'", [178 F.Supp. 643] relying primarily upon Section 129 of the Internal Revenue Code of 1939.[6]

■ To sustain the disallowance under Section 129, it must appear that the "principal purpose" of the acquisition of the stock of Hilo Gas by Refiners was "evasion or avoidance" of the tax. It is clear from the legislative history [7] and regulations [8] that to constitute the "principal purpose" the tax avoidance purpose must exceed in importance any other purpose.

The rule is well summarized in 7A Mertens, Law of Federal Income Taxation, § 42.228: "The prohibited purpose

4. Section 23(f), Int.Rev.Code of 1939, 26 U.S.C. § 23(f), allows a corporation a deduction for losses sustained during the taxable year. Section 122, 26 U.S.C. § 122 provides for the computation and carry-over of a net operating loss.

5. The explanation given in the statement attached to the 150-day letter of the Appellate Division reads in pertinent part:
 " 'It is held that, in substance, no deductible loss was sustained as the result of the sale of the utility assets of Hilo Gas Company, Ltd., to Honolulu Gas Company, Ltd., in 1950. In the event that a loss was sustained as a result of this transaction, it is held that such loss may not be included as a part of a consolidated net loss reported on a consolidated return filed by Pacific Refiners, Ltd., as a parent, and Hilo Gas Company, Ltd., as subsidiary, for the calendar year 1950 since the loss, if any, was sustained in, or was allocable to, the period prior to affiliation and before the consolidation became effective. Accordingly, the net loss, if any, sustained as the result of the sale of the utility assets of Hilo Gas Company, Ltd., to Honolulu Gas Company, Ltd., in the year 1950 may not be claimed as a part of the net operating loss deduction against the income of Pacific Refiners, Ltd., in the year 1953. The deduction claimed of $116,-405.64 is, therefore, disallowed.' "

6. Section 129(a) provides in pertinent part:
 "(a) Disallowance of deduction, credit or allowance. If (1) any person or persons acquire, on or after October 8, 1940, directly or indirectly, control of a corporation, or (2) any corporation acquires, on or after October 8, 1940, directly or indirectly, property of another corporation, not controlled, directly or indirectly, immediately prior to such acquisition, by such acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation, and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income or excess profits tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed." (26 U.S.C.1952 Ed. § 129.)

7. See Senate Report No. 627, 78th Cong. 1st Sess., Dec. 22, 1943, appearing at p. 1017, 1944 Cum.Bul.: "The House bill made section 129 operative if one of the principal purposes was tax avoidance. Your committee believes that the section should be operative only if the evasion or avoidance purpose outranks, or exceeds in importance, any other one purpose."

8. See Regulations 118, sec. 39.129-3 which provides in part: "If the purpose to evade or avoid Federal income or excess profits tax exceeds in importance any other purpose, it is the principal purpose. This does not mean that only those acquisitions fall within the provisions of section 129 which would not have been made if the evasion or avoidance purpose was not present. The determination of the purpose for which an acquisition was made requires a scrutiny of the entire circumstances in which the transaction or course of conduct occurred, in connection with the tax result claimed to arise therefrom."

of tax evasion must be the 'principal' purpose, and the principal purpose of a transaction does not become tax evasion merely because its tax consequences are considered by the parties to the transaction. Presence of the requisite purpose of tax evasion has been said to be chiefly an issue of fact." [9]

If the facts were in dispute, this court would accept the trial court's findings of fact. Here, however, the facts are stipulated, and the agreed facts in our opinion preclude a finding that tax avoidance was the "principal purpose" of the acquisition. The parties have stipulated that at the time of the acquisition of the stock on October 6, 1950, "no consideration was given by Refiners to the tax aspects of the transaction"; that "the officials of Refiners did not know what the book value of the Hilo Gas assets was and the Hilo Gas books were not made available to Refiners until after the decision had been made to purchase" the stock; that "Mr. Lyman has stated that the principal purpose on taking over Hilo Gas was to sell butane not then used by Hilo Gas"; that "it was not until November, 1950, that Refiners obtained advice on the tax aspects of the transaction." [10]

It is further stipulated that the general manager of Refiners, in presenting the proposal to the executive committee on September 16, 1950, "reviewed the advantages of the purchase of the Hilo Gas stock to provide an assured outlet for butane on the Island of Hawaii". In view of Refiners' commitment to Standard, it was "necessary or highly desirable" to obtain Hilo's outlet, plus the nonutility business of Hilo Gas—the distribution of liquefied petroleum gas in tanks to rural customers. Refiners' new refinery was scheduled for completion in the fall of 1950 (it was actually completed in December, 1950), and it was necessary to find outlets for its butane products. "Purchase of the stock would also assure Refiners of control of the nonutility ("rock gas") business of Hilo Gas in the outlying districts of the Island of Hawaii. [11]

Refiners and Hilo Gas became affiliated corporations prior to October 25, 1950. It is true, as appellee contends, that prior to acquisition of the Hilo Gas stock Refiners knew that Hilo Gas was in financial difficulties in 1948 and 1949. At the time of acquisition, however, Refiners did not know the book value of the assets of Hilo Gas (a corporation organized in 1927) or to what extent the assets might have been depreciated. Taxpayer has claimed a deduction for a loss which occurred after affiliation, on October 31, 1950, when Hilo Gas sold the utility assets to Honolulu Gas. No claim is made for any loss sustained prior to that time.

Moreover, Refiners itself sustained a loss of $93,092.00 in 1950, the year of the acquisition,[12] and was not required to

9. See also Commodores Point Terminal Corp. v. Commissioner, 1948, 11 T.C. 411, 418.

10. Stipulation of Facts XVI and XVII.

11. Stipulation of Fact V.

12. This is not a case where a corporation with large excess profits acquires a corporation with current or prospective losses for the purpose of reducing income or excess profit taxes. According to the Senate Report in connection with the enactment of Section 129, "The objective of the section, as stated in the report on the House bill, is to prevent the distortion through tax avoidance of the deduction, credit, or allowance provisions of the Code, particularly those of the type represented by the recently developed practice of corporations with large excess profits (or the interests controlling such corporations) acquiring corporations with current, past, or prospective losses or deductions, deficits, or current or unused excess profits credits, for the purpose of reducing income and excess profits taxes. The House report also recognizes that the legal effect of the section is, in large, to codify and emphasize the general principle set forth in Higgins v. Smith, (308 U.S. 473, [60 S.Ct. 355, 84 L.Ed. 406] (Ct.D.1934, C.B. 1940-1, 127)), and in other judicial decisions, as to the ineffectiveness of arrangements distorting or perverting deductions, credits, or allowances so that they no longer bear a reasonable busi-

pay any Federal or territorial income taxes for the years 1950, 1951 or 1952.[13]

Under the foregoing facts, which must be accepted as true, it cannot be said that any purpose of tax evasion or avoidance "exceeds in importance any other purpose". Moreover, there was here no determination by the Commissioner that the principal purpose of the acquisition was tax avoidance or that the acquisition served no business purpose.

The Government argues that when taxpayer decided to treat Hilo Gas as a newly acquired affiliate, Hilo Gas "was practically a defunct corporation" and "ripe for dissolution". Hilo Gas, however, was not a wholly inactive corporation subsequent to the sale of its assets. The parties have stipulated that until September, 1951 "Hilo Gas maintained the payroll, paid the office rent, and provided various other services for Refiners and Honolulu Gas on a cost-plus basis"; maintained a separate bank account until its dissolution; in 1951 entered into a two-year lease of an office building with option to renew for five years for a rental of $500 per month; in 1952 entered into a five-year lease of another office building for a rental of $275 per month; in 1955 entered into a ten-year lease of a butane distribution site; and until its dissolution, subleased office space to Honolulu Gas and Refiners, received income, filed returns and held stockholders' and directors' meetings.[14]

Neither the statutes nor regulations require corporate activity for continued af-filiation. "If conditions necessary to affiliation exist, the status will not be denied merely because one of the affiliated corporations is inactive; there is nothing in the statute which indicates that activity is essential to affiliation". 8 Mertens, Law of Federal Income Taxation, § 46.08.[15]

The Government concedes that the "facts of business purpose" justified the acquisition by the taxpayer of the *assets* of Hilo Gas and the liquidation of Hilo Gas as a corporate entity. It is argued that this is what the taxpayer intended when it purchased the stock of Hilo Gas; that it had arranged for the sale of the assets of Hilo Gas prior to purchase of the stock; that the taxpayer continued to carry out its plan of liquidation; and that the "later revival of Hilo Gas in November, 1950, to continue in existence as an affiliate of the taxpayer was admittedly prompted by tax considerations" and had no business purpose.

Neither the stipulated facts nor the provisions of the statute support these conclusions. The parties have agreed that the original plan of Refiners as the new controlling stockholder of Hilo Gas "had been to sell the utility assets to Honolulu Gas, to sell the remaining assets to Refiners and to dissolve the corporation at such time as the directors of that company determined in their discretion to be convenient".[16] The parties have agreed also that Refiners first considered the tax aspects of the transaction *after* the acquisition of the stock and *after* the sale of the assets.

ness relationship to the interests or enterprises which produced them and for the benefit of which they were provided."

13. Stipulation of Fact XIV.

14. Stipulation of Fact XX.

15. See also Autosales Corp. v. Commissioner, 2 Cir., 1930, 43 F.2d 931; Burnet v. Aluminum Goods Mfg. Co., 1933, 287 U.S. 544, 53 S.Ct. 227, 77 L.Ed. 484.

16. The initial negotiations between Englebright, general manager of Refiners, and Lyman, president and largest stockholder of Hilo Gas, did not envisage any acquisition at all. It was first proposed that Hilo Gas should cease manufacture of gas and distribute through its mains the product of Refiners. Lyman, however, wished to acquire, in addition, the franchise for distribution of Refiners' bottled product, "Isle Gas", throughout Hawaii. This was unacceptable to Refiners. It was suggested that Hilo Gas might discontinue distribution through mains altogether and convert all its customers' appliances to bottled gas. It was after this proposal was rejected that the parties began talking about an acquisition by Refiners of Hilo Gas stock. (Stipulation of Fact IV.)

In effect, the Government is saying that even though, at the time of acquisition, Refiners had a business and not a tax evasion purpose, when it *subsequently* ascertained the tax consequences it revived or kept Hilo Gas alive in order to take advantage of a possible loss carryover. The determining factor, however, is the intention or purpose of Refiners *at the time of acquisition.* Refiners having acquired control of Hilo Gas for business reasons alone and without considering the tax aspects of the transaction, the intention or purpose "for which (such) acquisition was made" would not be changed from a business into a tax evasion purpose when it subsequently ascertained the tax consequences of the transaction.

In support of its contentions that the primary purpose of the acquisition of Hilo Gas as an affiliate was to evade taxes under Section 129 and that taxpayer may not treat Hilo Gas as a "continuing affiliate in order to deduct the loss carryover", the Government relies upon Commissioner of Internal Revenue v. British Motor Car Distributors, Ltd., 9 Cir., 1960, 278 F.2d 392, reversing 31 T.C. 437, Elko Realty Co. v. Commissioner, 3 Cir., 1958, 260 F.2d 949, affirming 29 T.C. 1012, and American Pipe & Steel Corp. v. Commissioner, 9 Cir., 1957, 243 F.2d 125, affirming 25 T.C. 351. All are distinguishable. In British Motor Car Distributors, Ltd., it was not claimed that there was any business purpose in the acquisition and it was "clear that the principal purpose * * * was to avoid taxes" [278 F.2d 393]. In Elko and American Pipe & Steel Corp. the Commissioner had determined that the principal purpose of the acquisition was the avoidance of Federal income taxes. The Tax Court, in each case, sustained the Commissioner's determination, and the Court of Appeals held that the findings of the Tax Court were supported by substantial evidence. Not only is there an absence in the instant case of a determination by the Commissioner that the principal purpose of the transaction was tax avoidance; but there is also a stipulation of facts which precludes that determination. It is the purpose of the *acquisition* which is controlling under Section 129.

The Government contends further that, apart from Section 129, the deduction is prohibited by "other specific provisions and basic principles of the revenue laws". It is argued (1) that the taxpayer was not entitled to the privilege of filing a consolidated return under Section 141; and (2) that if the privilege were allowed, the Commissioner had ample authority under Sections 141(i) and 45[17] to disallow the deduction by allocating the sales to Hilo Gas in order to prevent a distortion of income.

Section 141 itself "prescribed no test of affiliation other than stock ownership".[18] Here, Refiners owned in excess of 95% of the voting power of all classes of stock of Hilo Gas, the prerequisite of an "affiliated group" under Section 141 (d).

■ Section 141(b) gives the Secretary (now the Commissioner or his delegate) power to prescribe "such regulations as he may deem necessary in order that the tax liability of any affiliated group of corporations" may be determined in such manner as to clearly reflect income and in order to prevent avoidance of tax liability. No regulation has been

---

17. Section 45 (as amended by Section 128 (b) of the Revenue Act of 1943, c. 63, 58 Stat. 48) reads as follows:

"Allocation of income and deductions. In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Commissioner is authorized to distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses." (26 U.S.C. 1952, Ed. § 45.)

18. John Fox, 17 C.C.H. T.C.M. 1006, 1019 (1958).

cited to justify appellee's conclusion that the taxpayer here was not entitled to the privilege of filing a consolidated return or that the claimed deduction should not be allowed. The consolidated return regulations enacted pursuant to Section 141(b) and here applicable are Regulations 129, effective for taxable years subsequent to December 31, 1949.[19] We find nothing in these regulations which would extend Section 129 or deny the privilege of filing a consolidated return in any case where it does not appear that the "principal purpose" for which the acquisition is made was evasion or avoidance of federal income taxes.

Presumably Section 129 was intended to prevent tax schemes designed to avoid taxes in contravention of the basic policies of Section 141 and other sections. Where no tax avoidance purpose is shown to exist, however, losses of the type here involved are deductible, not being within the prohibited purview of either Section 129, Section 141, or the regulations.

Subsequent amendments to Section 129 and the legislative history with respect thereto tend to confirm this conclusion. Section 269 of the Internal Revenue Code of 1954 (26 U.S.C. § 269), the successor to Section 129, provides in subsection (c) for "a presumption creating prima facie evidence of a principal purpose of tax evasion or avoidance where the consideration paid by any person or corporation upon an acquisition (to which Section 269(a) otherwise applies) is 'substantially disproportionate' to the aggregate of (1) the adjusted basis of the property directly or indirectly acquired, and (2) of the additional tax benefits also acquired which were not otherwise available".[20] Without departing from the "principal purpose" test of Section 129, Congress, in the enactment of Section 269(c) has provided a more objective method of determining the existence of a primary purpose of tax evasion or avoidance.

The Government argues that J. D. and A. B. Spreckels Co. v. Commissioner, 1940, 41 B.T.A. 370, is on "all fours" with the instant case. There, the "acquiring" corporation and the "acquired" corporation were held not to be "affiliates" within the meaning of Section 141 because there was no "business purpose" in the acquisition. It was simply a case where the court found that there was no business purpose, only a tax purpose. That case arose before the enactment of Section 129, but in effect the criteria of business purpose and tax evasion of Section 129 were applied. Where there is in fact no business purpose and the sole or principal purpose is tax evasion, the benefits of a consolidated return may be denied under either Section 129 or the Spreckels rule. Neither is applicable where the acquisition has a business purpose and tax evasion or avoidance is not the "principal purpose" of the acquisition.

More nearly in point is Bishop Trust Co., Ltd. v. Commissioner, 1937, 36 B.T.A. 1173, where the Tax Court found a "bona

19. Regulations 129 superseded Regulations 104 (consolidated income tax) and Regulations 110 (consolidated excess profit tax). The Government's position might be sustained under Section 23.31 of Regulations 104 as amended by T.D. 5341 on March 14, 1944, Cum.Bul.1944, p. 297, effective with respect to taxable years ending *prior* to December 31, 1949. See Rudick, Acquisitions to Avoid Income or Excess Profits Tax, 1944, 58 Harv.L.Rev. 196, 219. There are no comparable provisions, however, in Regulations 129.

20. Mertens Law of Federal Income Taxation, Code Commentary, sec. 269(c):2 where it is said further:

"Sec. 269(c):2. Undoubtedly the painful history of the Treasury Department's attempts to litigate the subjective problems of motive and intent inherent in Section 129 of the 1939 Code caused both the American Law Institute and ultimately the Congress in Section 269(c) to seek a more objective test as a basis for utilizing this antitax-avoidance provision. * * *

"As the Report of the Senate Finance Committee states, 'The effectiveness of this provision (Section 129 of the 1939 Code) has been impaired by the difficulty of establishing whether or not tax avoidance was the principal purpose of the acquisition. * * * It is believed that the addition of this new provision will strengthen enforcement of existing law in an area that has presented a serious tax-avoidance problem."

fide business motive", and held that affiliation was proper and a loss of a subsidiary after acquisition could be deducted in a consolidated return under Section 141, even though the shares of the subsidiary had been acquired when the subsidiary was in financial difficulty, its liabilities exceeded its assets, and a plan of liquidation was in contemplation.

We find no merit in the Government's contention that the Commissioner had authority to disallow the deduction by allocating it solely to Hilo Gas "in order to prevent a distortion of income" pursuant to Sections 141(i) and 45. The fact remains that the Commissioner did not "distribute, apportion, or allocate * * * deductions * * * between or among" Refiners and Hilo Gas. He disallowed the deduction entirely, as part of the consolidated net loss on the consolidated return filed by Refiners and Hilo Gas, for the reason that the loss "was sustained in, or was allocable to, the period prior to affiliation and before the consolidation became effective".

Clearly, Section 45 was not applied, nor may it now be relied upon to sustain the Commissioner. In Hypotheek Land Co. v. Commissioner, 1952, 200 F.2d 390, 396, this court said: "In connection with section 45 of the Internal Revenue Code, it should be pointed out that whatever his view of the close association between petitioner and the Dutch banks, this clearly disclosed fact did not lead the Commissioner to make any attempt to 'allocate, distribute or apportion' income between the corporations. He merely

21. In Lewyt Corp. v. Commissioner, 1955, 349 U.S. 237, 75 S.Ct. 736, 739, 99 L. Ed. 1029, the Supreme Court said: "But the rule that general equitable considerations do not control the measure of deductions or tax benefits cuts both ways. It is as applicable to the Government as to the taxpayer Congress may be strict or lavish in its allowance of deductions or tax benefits. The formula it writes may be arbitrary and harsh in its applications. But where the benefit claimed by the taxpayer is fairly within the statutory language and the construction sought is in harmony with the statute as

disallowed the deduction. Section 45 nowhere permits disallowance of a deduction, the action herein taken by him. General Industries Corp. v. Commissioner, 35 B.T.A. 615, 617."

It cannot be denied that the taxpayer is the beneficiary of an unexpected tax windfall. This, in itself, however, will not justify the disallowance of the deduction.[21] Under the applicable statutes and regulations, the propriety of disallowing the "loss carry-over" depends upon whether the principal purpose of the acquisition of Hilo Gas by Refiners was tax evasion or avoidance. We must conclude from the agreed facts that tax evasion was not the principal purpose of the acquisition. The claimed deduction accordingly must be allowed.

### Was Taxpayer Entitled to Deduct Taxes Paid Territory of Hawaii in 1955 Return?

Pursuant to a plan of liquidation adopted by the stockholders on November 25, 1955, Refiners sold its refining facilities to Standard on December 6, 1955, and the Isle-Gas business and related assets to Honolulu Gas on December 31, 1955. Thereafter all of the assets (less assets retained to meet claims) were distributed in complete liquidation, and the corporation was dissolved by order of the Treasurer of the Territory of Hawaii on November 16, 1956, within twelve months of the adoption of the plan of liquidation. No gain or loss to Refiners was recognized on the sale of the assets pursuant to the provisions of Section 337, Internal Revenue Code of 1954.[22]

an organic whole, the benefits will not be withheld from the taxpayer though they represent an unexpected windfall."

22. "(a) General rule.—If—
"(1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and
"(2) within the 12-month period beginning on the date of the adoption of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims, then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-

In its 1955 income tax return, Refiners claimed a deduction for income taxes paid the Territory of Hawaii, which included $61,061.59 allocated by the Commissioner to gains from the sale of Refiners' assets. This amount was disallowed, the Commissioner assigning as the reason for the disallowance that Section 265 of the Internal Revenue Code of 1954 "prohibits the deduction of expenses allocable to income exempt from federal income tax." [23]

The district court, in sustaining the Commissioner, concluded that inasmuch as no gain or loss to Refiners was recognized on the sale of the assets under the provisions of Section 337, "this nontaxable gain qualified as exempt income under Section 265(1)" and Refiners accordingly was not entitled to the claimed deduction of $61,061.59.

Appellant contends (1) that "nonrecognized" gains under Section 337 are not income "wholly exempt" under Section 265; and (2) that the territorial taxes paid are not "expenses" within the meaning of Section 265(1).

 Section 337 was enacted to avoid double taxation at *both* the *corporate* and *shareholder* levels where a corporation sells its assets at a profit and completely liquidates within one year. In Commissioner of Internal Revenue v. Court Holding Co., 1945, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981, it was found that the corporation itself had negotiated the sale of its assets, followed by liquidation and transfer of legal title by the shareholders. This resulted in a taxable gain to the corporation on the sale and a taxable gain to the shareholders on the liquidation. In United States v. Cumberland Public Service Co., 1950, 338 U.S. 451, 70 S.Ct. 280, 94 L.Ed. 251, it was found that the sale was made by the shareholders rather than the corporation, so that only one tax, on the liquidation, was incurred.

It is clear from the legislative history of Section 337 that the purpose of this legislation was to provide "a definitive rule which will eliminate any uncertainty" in determining whether the sale was in fact made by the corporation or the shareholders. The House Report, after referring to the decisions in Court Holding and Cumberland, states in part:

"In order to eliminate questions resulting only from formalities, your committee has provided that if a corporation in process of liquidation sells assets there will be no tax at the corporate level, but any gain realized will be taxed to the distributee-shareholder, as ordinary income or capital gain depending on the character of the asset sold.[24]

\* \* \* \* \*

" \* \* \* under present law, the tax consequences arising from sales made in the course of liquidation depend primarily upon the formal manner in which transactions are arranged. The possibility that double taxation may occur in such cases results in causing the problem to be a trap for the unwary.

\* \* \* \* \* \*

" 'Subsection (a) accordingly permits the imposition of a single tax at the shareholder level upon property sold during the course of a liquidation irrespective of whether the corporation or the shareholder in fact effected the sale provided the

---

month period. \* \* \*" (26 U.S.C. 1958 Ed. § 337.)

23. "No deduction shall be allowed for—
"(1) Expenses.—Any amount otherwise allowable as a deduction which is allocable to one or more classes of income other than interest (whether or not any amount of income of that class or classes is received or accrued) wholly exempt from the taxes imposed by this subtitle, or any amount otherwise allowable under

section 212 (relating to expenses for production of income) which is allocable to interest (whether or not any amount of such interest is received or accrued) wholly exempt from the taxes imposed by this subtitle. \* \* \*" (26 U.S.C. 1958 Ed. § 265.)

24. H.Rep.1337, 83d Cong., 2d Sess.1954, pp. 38–39. (U.S.Code Cong. & Adm. News, 1954, p. 4064.)

other provisions of this subsection are met. \* \* \* ' " [25]

Section 265(1) relates to income which is "wholly exempt" from the imposition of taxes. Section 1.265–1 of the Regulations refers more specifically to the meaning of the terms "wholly exempt" and "nonexempt income", reading in part as follows:

"(b) Exempt income and nonexempt income. (1) As used in this section, the term 'class of exempt income' means any class of income (whether or not any amount of income of such class is received or accrued) wholly exempt from the taxes imposed by subtitle A of the Internal Revenue Code of 1954. For purposes of this section, a class of income which is considered as wholly exempt from the taxes imposed by subtitle A includes any class of income which is—

"(i) Wholly excluded from gross income under any provision of subtitle A, or

"(ii) Wholly exempt from the taxes imposed by subtitle A under the provisions of any other law.

"(2) As used in this section the term 'nonexempt income' means any income which is required to be included in gross income."

Section 337 does not provide that the gain shall not be included in gross income or that it shall be exempt from the tax, but rather that "no gain or loss shall be recognized" to the corporation under the conditions therein specified.[26] Income which is not includable in gross income obviously is "wholly exempt". The Government argues that income which is includable in gross income but is not "recognized" by reason of Sec. 337 is also

"wholly exempt", since no tax is imposed on the *corporation* on any capital gain. Neither the statutes nor regulations support this conclusion. The purpose of Section 265 was to prevent a deduction from income which is never to be taxed. It was not the intention of Congress, in enacting Section 337, to "exempt" any gain from the tax, but rather to provide that the gain should not be taxed twice, both at the corporate and shareholder levels, where the taxpayer complies with the provisions of the Act.

 Apparently this is the first case involving the application of Section 265 (1) to a Section 337 liquidation. Under a different factual situation, however, the Tax Court in Cotton States Fertilizer Co. v. Commissioner, 1957, 28 T.C. 1169 (acq., 1958–1 Cum.Bul. 4) recognized the distinction between "nonrecognized gains" and "wholly exempt income". It was there held that gains not recognized by virtue of Section 112(f), I.R.C.1939, 26 U.S.C. § 112(f), were not "wholly exempt" within the meaning of Section 24(a) (5), I.R.C.1939, 26 U.S.C. § 24(a) (5) (the predecessor of Section 265(1), I.R.C.1954). Section 112(f) provides that no gain shall be recognized if property is involuntarily converted into other property. Two of the taxpayer's plants were destroyed by fire. In connection with a claim for fire insurance, the taxpayer employed architects and contractors in estimating the replacement costs. As a result of the claims, the taxpayer recovered insurance exceeding the cost basis for the destroyed property. The proceeds were used to replace the property and no gain was reported in accordance with Section 112(f). A deduction claimed for the amounts paid the architect and contractor was disallowed by the Commissioner. The Commissioner con-

---

25. H.Rep. 1337, 83d Cong., 2d Sess.1954, pp. A106–107. (U.S.Code Cong. & Adm. News, 1954, p. 4244.) See also S.Rep. 1622, 83d Cong., 2d Sess., 1954, pp. 48–49, (U.S.Code Cong. & Adm.News, 1954, p. 4679) and p. 758, (U.S.Code Cong. & Adm.News, 1954, p. 4896); Cohen, Gelberg, Surrey, Tarleau and Warren,

"Corporate Liquidations under the Internal Revenue Code of 1954," 55 Colum. L.Rev. 37, 44 (Jan. 1955).

26. If the liquidation is not wholly completed within the 12-month period, then the tax on the capital gain would be incurred where the sale is made by the corporation.

tended that "because petitioner was not required under Section 112(f) (3) (A) to recognize any gain, such gain must be considered as 'income * * * wholly exempt' as that term is used in Section 24(a) (5)". The Tax Court rejected this contention and held, "The insurance proceeds did not become 'income * * * wholly exempt' by reason of petitioner's election under Section 112(f)". The court pointed out that if the new property were sold in a subsequent year, any gain realized on the involuntary conversion would be reflected in the income reported in the year of sale; that Section 112(f) did not result in giving a "wholly exempt" classification to income received on an involuntary conversion, but at best provided for the postponement of the tax.

Appellee attempts to distinguish the Cotton States Fertilizer case on the ground that Section 337 does not effect a postponement of the tax, as far as the corporation is concerned, but effects a complete exemption because the corporation is never taxed on the nonrecognized gain. It is true of course that under a Section 337 liquidation the corporation itself will not be taxed on the capital gain, where the liquidation is completed within twelve months. While the corporation is not taxed, however, the shareholders to whom the proceeds of the liquidation are distributed are taxed on the capital gain, although on a different basis than the gain to the corporation. Section 337 does not *eliminate* entirely the tax on the gains realized from sale and liquidation, but rather *limits* the tax to that paid by the shareholders on liquidation and further limits to a period of twelve months the

nonrecognition of the gain to the corporation itself.

It is true also that Cotton States Fertilizer Co. refers to a "postponement" of the tax by reason of the fact that if the new property is sold at a profit in a subsequent year, any gain would be reflected in the income reported in the year of sale. This is not, however, the sole basis of the Tax Court's conclusion that the deduction was allowable. The primary basis of the holding is the fact that nonrecognized gains are not exempt income within the meaning of Section 24 (a) (5), I.R.C.1939 (the predecessor of Section 265(1), I.R.C.1954).[27]

There is a valid distinction between "wholly exempt" income and income on which "no gain or loss is recognized". Wholly exempt income is never taxed. Nonrecognized gains are not taxed in the particular transaction that qualifies for nonrecognition treatment. They may be taxed, however, if the transaction fails to meet the nonrecognition requirements and may also be taxed at another time. In other words, they are not "wholly exempt" from the tax.

We conclude accordingly that Section 265(1) is not here applicable for the reason that the gains involved, which are nonrecognized under Section 337, are not allocable to income "wholly exempt" from tax, and that appellant is entitled to the claimed deduction of $61,061.59.

Having reached this conclusion it is unnecessary to pass upon appellant's contention that Section 265 is also inapplicable because state income taxes are not deductions as "expenses" within the meaning of Section 265.[28]

---

27. The Tax Court said: "Sections 22(b) and 116 list a great number of items which, according to these sections of the statute, 'shall not be included in gross income, and shall be exempt from taxation under this chapter.' Nowhere in these sections are proceeds from fire insurance listed as being exempt." Cases cited by the Commissioner were not in point "as they involve only life insurance proceeds which are made wholly exempt by statute".

28. It is recognized that the Tax Court has in five cases denied deductions for taxes under Section 24(a) (5), I.R.C.1939, the predecessor to Section 265, I.R.C.1954, i. e., Marsman v. Commissioner, 1952, 18 T.C. 1, affirmed on other grounds, 205 F.2d 343; Heffelfinger v. Commissioner, 1945, 5 T.C. 985; Curtis v. Commissioner, 1944, 3 T.C. 648; Keith v. Commissioner, 1942, T.C. Memo. 108883, affirmed on other grounds 2 Cir., 1944, 139 F.2d 596, 154 A.L.R. 931; and Holleran v. Commissioner, B.T.A. Memo. 106736, 106737.

Judgment reversed. The deductions claimed by the taxpayer are allowed and judgment will be entered for appellant in accordance with this opinion.