854

PEPI, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 276–67.  Filed August 25, 1969.

*Ben Herzberg, Sherwin Kamin,* and *Robert J. Wolpert,* for the petitioner.

*William F. Chapman* and *Larry Kars,* for the respondent.

OPINION

The issue is whether petitioner is entitled to net operating loss deductions sustained in prior years under its former name. The resolution of that issue depends upon whether the principal purpose of Industries in effecting the 1957 merger of Old Philips and Hollander was to secure the tax benefit of Hollander's carryover losses. Respondent determined that the losses were not deductible pursuant to section 269 because the "principal purpose" for the acquisition of Hollander was to secure a tax benefit not otherwise enjoyable.

Section 269 as applicable to the years in issue provides that if "any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation * * * and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed." Since the determination of respondent is presumptively correct, petitioner has the burden of showing that the acquisition of Hollander was to serve a business purpose and that the principal purpose for such acquisition was not the evasion or avoidance of income tax. *American Pipe & Steel Corporation*, 25 T.C. 351 (1955), affd. 243 F. 2d 125 (C.A.9, 1957), certiorari denied 355 U.S. 906 (1957); *Naeter Brothers Publishing Co.*, 42 T.C. 1 (1964). See also sec. 1.269-3(b), Income Tax Regs., and example (1) stating the basic facts of a merger that brings the acquired loss corporation's deductions into conjunction with the income of the acquirer corporation

will, in the absence of additional evidence to the contrary, be "indicative that the principal purpose for acquiring control was evasion or avoidance of Federal income tax."

In order for the tax purpose to be found to be the principal purpose under section 269 it must exceed in importance all other purposes. Sec. 1.269–3 (a) (2), Income Tax Regs.; *Hawaiian Trust Co.* v. *United States*, 291 F. 2d 761 (C.A. 9, 1961).

Petitioner argues that the evidence establishes its acquisition of control of Hollander was not tax motivated and it had other sound business reasons for acquiring control of Hollander. Petitioner points to the evidence that Philips wanted Hollander because it was a public corporation with listed stock on the New York Stock Exchange and it had a profitable chemical business which was a business in an industry in which the Philips companies were interested. Petitioner argues these business reasons constituted the principal purpose for Philips acquiring Hollander and not the expectation of using the latter's $2-million-plus loss carryover.

Petitioner introduced two witnesses who were members of the Industrial Expansion Committee of the American Philips companies and who were present during the committee's consideration of the possible acquisition of Hollander. Robert Dettmer, the coordinator of growth and expansion on the committee, testified that when he first heard about Hollander in January of 1957 he realized that it fit the needs of the acquisition program of Philips. He stated in summary that (1) it was not so large that control could not be effected, (2) that it was a listed stock which would provide for the issuance of marketable securities for further expansion, and (3) that it had a profitable chemical business which would provide for an opening into the pharmaceutical field in which Philips was interested. He testified that these purposes were the only motivating factors that existed for the acquisition and control of Hollander. Arie Vernes, who was vice president of the Philips companies and a member of the committee, stated that he agreed with the testimony of Dettmer.

Petitioner argues that the corporate purpose of Philips is to be determined from the facts and circumstances as they existed in March of 1957 when the Industrial Expansion Committee made its decision to have Philips acquire Hollander. Petitioner felt no necessity to explain the earlier events and conduct of American Philips corporations' men beginning in May of 1956, indicating the existence of some informal understanding between Hollander's top management and American Philips corporations' men with regard to a possible merger with an American Philips company. Respondent argues these earlier circumstances must be scrutinized, and, when given due consideration, they show a series of coordinated moves whereby Philips planned to

acquire Hollander for the principal purpose of using Hollander's losses as a deduction against Old Philips income.

We agree that the circumstances and events prior to the decision of the committee in March of 1957 must be examined. Section 1.269–3(a) (2), Income Tax Regs., provides, in part:

The determination of the purpose for which an acquisition was made requires a scrutiny of the entire circumstances in which the transaction or course of conduct occurred, * * *

See also *J. T. Slocomb Co.*, 38 T.C. 752, 764, where the inquiry was the business purpose of a merger, and we said: "The [business] purpose can more readily be determined by a thorough evaluation of the entire record and the inferences to be drawn therefrom."

Any scrutiny of the circumstances surrounding this merger to determine the purpose of this acquisition must include the events that occurred in 1956.

Respondent's theory is that the merger was plotted or planned in the fore part of that year when Hollander still had its losing fur business and its large carryover losses. Petitioner points out that there is just no evidence at all of any such plot or plan in 1956. It is true that there is no direct evidence of 1956 merger negotiations between Hollander and Philips. However, there is evidence by the testimony of petitioner's witness, Collins, that indicates some contact by a merger man of Philips companies with the top management of Hollander in the first half of 1956.

Collins was the New York lawyer who had represented the Philips companies in the Reynolds acquisition in 1954, the Alliance department acquisition in May and June of 1955, and the Price Electric Co. acquisition late in 1955. He testified that he was "called in" to Hollander around the last of May of 1956 and from that time on he worked full time on the activities of Hollander with respect to disposing of Hollander's fur business and its purchase of Brook, including the financing of that purchase.[4] The significant part of his testimony is that when he was asked on cross-examination who had called him in to the Hollander Company, he replied: "I believe it was Mr. Utermohlen who had recommended me to the Hollander Company. The actual request that I become counsel to the company came from Mr. Colt [the president of Hollander]."

Petitioner's witnesses describe Utermohlen as a longtime executive of American Philips companies, with some connection with the Dutch Philips companies at an earlier time. He is described by petitioner's witnesses as the financial and economic advisor of the Philips cluster of corporations, with special skills as a financial technician and evalu-

---

[4] At the time of trial Collins testified that he was secretary and manager of the Legal Department of Consolidated Electronics, Inc., and petitioner and a number of their subsidiaries.

ator of corporations. He was also a member of the Industrial Expansion Committee whose concern was the acquisition of other corporations by mergers of such corporations with various companies in the Philips group.

Thus we have the evidence that Utermohlen, who can be described as a Philips company merger expert, recommended the lawyer who had handled the Philips group's 1954 and 1955 mergers, to Hollander sometime in May or the earlier months of 1956. The record also shows that the S. D. Leidersdorf firm of accountants had been auditors for Hollander through 1955 and that in 1956 Hollander switched to Smith and Harder firm of accountants who were also the auditors for all of the American Philips companies. In the light of what we know occurred later in 1956, and in the complete absence of any explanation or any evidence to the contrary by petitioner, there is a natural inference that this early contact resulted at least in informal merger talks between Utermohlen speaking for Philips and top management speaking for Hollander. And at that time, when its only business was the losing fur business, about the only thing that would be attractive to Philips would be Hollander's large carryover loss that might be used to offset Philips' substantial income.

This inference that these early negotiations led toward merger and Philips' use of the loss becomes stronger by reason of what occurred in the remaining months of 1956. It is obvious Philips did not want the losing fur business. To merge and get rid of it later would indicate the principal purpose of the merger was the use of the loss carryover. See *Arthur T. Beckett*, 41 T.C. 386 (1963). The losing fur business had to be disposed of before the merger just as North American Philips had seen to it that Reynolds disposed of the losing spring business before the 1954 merger. During the next few months Collins performed services for Hollander in the matter of its spin-off of its fur business assets to a newly formed corporation. This work was completed around September or October of 1956. When the spin-off was completed Hollander was little more than a corporate shell in that it had no operating business assets. It did have real estate and other assets of about a million and a half dollars. It was in the same position as Reynolds in 1954, after it had disposed of its losing spring business, just prior to its merger with North American Philips Co. It was a listed company with an attractive loss carryover of over $2 million but no operating assets. Anyone acquiring such a company would be quite vulnerable to the charge that the acquisition was for the primary purpose of using the loss carryover. *Naeter Brothers Publishing Co., supra;* and *Fawn Fashions, Inc.,* 41 T.C. 205 (1963).

In October Collins handled Hollander's purchase of Brook. Collins testified he had heard about Brook and the fact it might be acquired the previous August. This chemical company could only be acquired

for cash. The purchase of this company required Hollander to borrow a large amount of money. Since Hollander at that time was not operating any business it could not secure the necessary financing through ordinary banking channels to make this purchase.

Again Paul Utermohlen, the longtime employee and executive of the Philips group, and the financial adviser of the Philips companies and the exceptionally clever financial technician, helped Hollander. He worked with Collins in securing the loan of the debenture in the face amount of $1,600,000 needed by Hollander to finance its purchase of Brook. Utermohlen secured the help of a Delaware corporation known as the Schuyler Corp. All of the stock of this corporation was owned by a foundation that had been established as a welfare fund for employees, and their beneficiaries, of Dutch Philips. Paul Utermohlen was described by petitioner's witnesses as "almost a business manager for Schuyler Corporation." He arranged the required financing to enable Hollander to buy Brook by having Schuyler lend a $1,600,000 convertible debenture to Hollander which was used by Hollander as collateral security for a loan from two investment companies. A condition for the making of this loan of the debenture by Schuyler was that Hollander execute a strange sort of agreement with Schuyler which, in effect, gave Schuyler the right to insist that Hollander enter into an acquisition or merger, not with Schuyler which was not an operating company, but with another company "offered or specified by Schuyler" meeting certain requirements.[5] With Utermohlen's position with American Philips companies and his position with Schuyler, it is not hard to guess the company that Utermohlen would "offer or specify." The agreement Utermohlen negotiated was in effect tailor made to require Hollander to merge with another Utermohlen alter ego, namely, a company in the Philips group.

Hollander executed the required agreement and after Brook was purchased by Hollander it was immediately dissolved and its chemical business was operated as a department of Hollander. Now Hollander was a corporation with a promising business as well as an attractive loss carryover. And the promising business had been infused into the Hollander shell by those who could only be called American Philips corporations' men. And these men had seen to it that Hollander could be required to merge into the Philips group.

It fairly appears from the record that the fact that the merger proposal was to be submitted to the Hollander stockholders was not

---

[5] Collins testified: "But much more important is, Schuyler insisted that as the primary consideration for making this collateral available [the $1,600,000 debenture], that it get an option * * * to bring to Hollander a business, a business enterprise, * * * which would have certain financial charactics [sic], on the understanding that in the event Schuyler presented such a business enterprise to Hollander, that Hollander, subject to the approval of its stockholders, would acquire such business enterprise on the basis of issuing shares of Hollander at ten dollars a share against the net worth of the business enterprise so produced."

considered much of a problem. Hollander was not a large company and its top management, with whom Utermohlen and Collins were dealing, owned or controlled 29 percent of its stock. The inference is strong that Utermohlen and Hollander's top management had long been in basic agreement on the advisability of the merger.

We are not impressed with the recitation in the proxy statement sent by Hollander to its stockholders to the effect that the Philips companies gave no consideration to the availability of the operating loss carryover in determining the advisability of the merger. There is a slight semblance of contrivance in this statement that tells Hollander's stockholders what Philips considered.

The evidence is that the decision to acquire Hollander was taken by the committee in March of 1957 and the merger was completed in July of 1957. But this decision was only the final step which was contemplated in 1956 when Utermohlen, another member of the committee, started his contact with Hollander. When the evidence of these earlier events, which stands undisputed, is scrutinized we see the formation of a corporate purpose on the part of Philips in 1956 to acquire Hollander for the primary purpose of utilizing its carryover losses. It fairly appears that it was to be a step acquisition with the first step to have Hollander dispose of its losing fur business. It was the American Philips corporations' men who engineered this spin-off. The second step was to aid Hollander to get a new profitable business. It was the American Philips corporations' men who engineered Hollander's acquisition of Brook; and they did it in such a way as to preclude Hollander from refusing to merge with another company of their selection.

Petitioner's evidence is based on the circumstances as they existed in March of 1957 when the committee took what might be called the final step or the formal decision to acquire Hollander. But, as we have stated, the course of conduct that preceded this decision must be considered on the issue of the principal purpose for the acquisition. *Temple Square Mfg. Co.*, 36 T.C. 88 (1961); *Swiss Colony, Inc.*, 52 T.C. 25 (1969). When the earlier events are considered the obvious conclusion is that they are but steps in a plan designed to achieve the use of Hollander's large loss carryover by Philips.

Petitioner's argument that it acquired Hollander in order to get its profitable chemical business is not very persuasive. This was a business that could be bought for cash and the financing of a direct purchase by a company in the American Philips group would have been simple. The American Philips companies' men did not need to go to all the work of helping Hollander, then almost a corporate shell, finance the purchase of Brook and then have Philips acquire Hollander. We think it was the goal of Philips' use of the loss carryover that prompted this round-about acquisition of the chemical business.

We do not feel that petitioner established that its primary purpose in the merger was not the use of the loss carryover. It may well be that the fact Hollander was a public company made the merger more desirable. But we cannot allot to that desire the primary purpose for the merger. Dettmer testified that the desire to secure a public company for the Philips group was the sole and only purpose for the 1954 merger of North American Philips Co. with Reynolds. There the post-merger use of the approximately $750,000 carryover loss was disallowed. Besides the argument is weaker now for at the time of this merger the American Philips group had one public company whose stock was traded on the New York Stock Exchange, namely, Consolidated Electronics Industries Corp.

The activities of Utermohlen, a member of the Industrial Expansion Committee, with respect to this merger stand completely unexplained. With no evidence to the contrary the only conclusion to be drawn from his conduct is the tax saving motive that might result from the merger he was attempting to secure for Philips. Petitioner did not see fit to have Utermohlen testify though petitioner's counsel states on brief he was available. He suggests counsel for respondent should have subpoenaed him as a witness if his testimony was desired. The point is the burden was on petitioner and the record shows that Utermohlen was an active man in this merger. Dettmer, who was petitioner's chief witness and also a member of the Industrial Expansion Committee, was relied upon by petitioner to give the corporate purpose for the merger. He said he did not learn about the possibility of acquiring Hollander until January of 1957, though he said he was constantly looking for other companies suitable for merger and he saw both Utermohlen and Collins frequently. This was long after Utermohlen had started his activities that were obviously designed to accomplish the merger that ultimately resulted.

One other comment should be made with respect to petitioner's evidence in this case. It would seem that corporate purpose should be established by a corporation's top officers or by those who shape the policy of the corporation—the group often called the corporation's "top management." We do not have stockholder-officers of these American Philips companies. All of the stock of Old Philips was owned by Industries and all of the stock of Industries was owned by the trust in Hartford for the benefit of the stockholders of the Dutch companies. However, each American company did have its complement of officers and some of them were stockholders in the Dutch companies.

Dettmer, on whom petitioner chiefly relied, was not an officer in Industries that owned all of the stock of Old Philips. He was a stockholder in the Dutch companies. He said the policy of the American Philips companies with respect to acquisitions would be set by the

committee but van den Berg was the president of Industries and Dettmer went on to say: "van den Berg was ultimately responsible as the senior executive, and therefore he had without any question the right of veto over decisions." Dettmer also said Vernes was the senior vice president and in the absence of van den Berg "would have had that right of veto." van den Berg did not testify. The only explanation is that he left for Europe 8 days before the trial. Vernes, who was retired at the time of trial, said he was a stockholder in the Dutch companies. As stated, he testified that Dettmer's testimony concerning the committee meeting on March 27, 1957, when the acquisition of Hollander was discussed and recommended, was correct. However, it appeared he had but little independent recollection of the meeting. He could not remember whether the fact that Hollander had a loss carryover was discussed but he thought it must have been discussed for as he said, "it is an integral part of the financial situation that you are considering."

Thus the record shows that the role of Dettmer, petitioner's chief witness, was that of a subordinate advisor and also the collective decision of the committee was subject to the veto of van den Berg. He was the senior officer of the interlocking directors of the Philips group of American companies. Since van den Berg was the officer of Philips who determined and shaped the policy of the corporation, the testimony of Dettmer becomes little more than advice which was subject to the decisive will of others.

We hold petitioner failed to carry its burden in this case. The evidence it presented fails to establish that the principal purpose of the merger was not to secure the benefit of Hollander's losses as a deduction from Old Philips' earnings. We uphold the Commissioner's determination that Philips was not entitled to the claimed net operating loss carry-forward.

*Decision will be entered under Rule 50.*