D'ARCY-MACMANUS & MASIUS, INC. (AS SUCCESSOR TO
MACMANUS, JOHN AND ADAMS, INC.), PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 8593-71, 8594-71.    Filed January 2, 1975.

*Herrick K. Lidstone, Carl B. Cordes,* and *Earl G. Thompson,*
for the petitioner.

*Jeffrey L. Davidson* and *Walter C. Welsh,* for the respondent.

STERRETT, *Judge:* The respondent determined deficiencies in
the Federal income taxes of MacManus, John & Adams, Inc.[1]
(docket No. 8593-71), of which petitioner is the successor by a
subsequent consolidation of MacManus, John & Adams, Inc.,
with D'Arcy Advertising Co. to form D'Arcy, MacManus,
Intermarco, Inc., and an even later merger of Masius, Wynne-
Williams, Inc., into petitioner, and in the Federal income taxes of
West, Weir & Bartel, Inc. (Cal.), which was merged and
liquidated into MacManus, John & Adams, Inc., and hence of
petitioner, against whom transferee liability is asserted, as
follows:

| Docket No. | Year | Deficiency |
|---|---|---|
| 8593-71 | 1968 | $37,419.19 |
| 8594-71 | 1967 | 7,966.16 |
| | Jan. 1, 1968, to June 30, 1968 | 16,153.81 |

It is stipulated that if any income tax deficiencies exist against
West, Weir & Bartel, Inc. (Cal.), in docket No. 8594-71
petitioner is liable for them as transferee.[2] Certain issues not
having been raised in the petitions, the sole issue for determi-
nation is whether the principal purpose motivating West, Weir &
Bartel, Inc.'s (Cal.) acquisition of the property of Hal Stebbins,
Inc., was the evasion or avoidance of Federal income tax within

[1] Petitioner's predecessor's name appeared in the petition filed herein as "MacManus,
John and Adams, Inc." However, from an examination of the exhibits herein, we conclude
that the correct name is "MacManus, John & Adams, Inc."

[2] There is not, nor apparently ever was, any dispute that petitioner is liable for any
income tax deficiency found due in docket No. 8593-71.

the meaning of section 269, I.R.C. 1954,[3] with the result that the net operating loss carryover of Hal Stebbins, Inc., is not available as a deduction to West, Weir & Bartel, Inc. (Cal.), or to MacManus, John & Adams, Inc.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

Petitioner D'Arcy-MacManus & Masius, Inc., is a corporation organized under the laws of the State of Delaware. Petitioner's predecessor, MacManus, John & Adams, Inc., to whom the statutory notices of deficiency in both dockets were sent, filed its Federal income tax return for the taxable year 1968 with the district director of internal revenue at Detroit, Mich. West, Weir & Bartel, Inc. (Cal.), which was merged and liquidated into its then new parent MacManus, John & Adams, Inc., on August 30, 1968, filed its Federal income tax returns for the taxable year 1967 and the short year January 1, 1968, to June 30, 1968, with the district director of internal revenue at Los Angeles, Calif.

Because of the number of corporate transactions involved in this case, we think it helpful to give a brief sketch of these transactions which resulted in the formation of petitioner following the acquisition of Hal Stebbins, Inc., by West, Weir & Bartel, Inc. (Cal.). On or about April 29, 1968, MacManus, John & Adams, Inc. (hereinafter MJA), entered into a Plan and Agreement of Merger with West, Weir & Bartel, Inc. (hereinafter WWB-NY), a New York-based advertising agency. West, Weir & Bartel, Inc. (Cal.) (hereinafter WWB-Cal), was the wholly owned subsidiary of WWB-NY. On July 28, 1968, WWB-NY was merged into MJA pursuant to the merger laws of the States of New York and Michigan, and the combined advertising agency businesses of MJA and WWB-NY were carried on by MJA as the surviving corporation of the statutory merger. On August 30, 1968, WWB-Cal was merged and liquidated into its new parent MJA. Effective January 1, 1971, MJA and D'Arcy Advertising Co., a Delaware corporation and a national advertising agency, were consolidated under the laws of the States of Michigan and Delaware to form D'Arcy, MacManus International, Inc. (herein-

---

[3] All statutory references are to the Internal Revenue Code of 1954, as in effect during the taxable years in issue, unless otherwise noted.

after DMI). During 1971, DMI formally changed its corporate name first to D'Arcy, MacManus Intermarco, Inc., and later back to DMI.

On or about December 23, 1972, Masius, Wynne-Williams, Inc. (hereinafter MWW), a New York-based advertising agency and the wholly owned subsidiary of Masius, Wynne-Williams (Holdings) Ltd., a United Kingdom corporation, was merged into DMI under the laws of the States of New York and Delaware. The name of DMI, as the surviving corporation, was changed to D'Arcy-MacManus & Masius, Inc., the petitioner herein. Petitioner has carried on the advertising business formerly carried on separately by DMI and MWW.

WWB-NY was a New York corporation organized on November 1, 1929, under the name of Donahue & Co., Inc. In 1964, Donahue & Co., Inc., and Ellington & Co., both national advertising agencies, merged with the surviving company known as WWB-NY. Both Donahue & Co., Inc., and Ellington & Co. had local branch offices in Los Angeles which, after the 1964 merger, were combined into a single office.

Walter Weir (hereinafter Weir) was chairman of the executive committee of WWB-NY at the time of the 1964 merger of Donahue & Co., Inc., and Ellington & Co. and continued in that position until April 1965 when he became president of WWB-NY upon the removal of the former president by WWB-NY's stockholders.

After the combination of the Los Angeles branch offices of WWB-NY, difficulties arose with respect to the management of that combined office with the result that one manager of that office left and the subsequent one was fired. At this point the Los Angeles office of WWB-NY was mostly an industrial advertising shop. Weir believed that the Los Angeles office needed a manager experienced in industrial advertising and needed to increase its consumer advertising function and its creativity. To these ends, Weir went to Los Angeles to investigate a number of Los Angeles agencies.

In 1965, about a year after initial contact, WWB-NY acquired Getz & Sandborg, Inc. (hereinafter G&S), a Los Angeles advertising agency that was headed by Richard A. Getz (hereinafter Getz). After its acquisition by WWB-NY, G&S's name was changed to WWB-Cal and it carried on the businesses of both G&S and the Los Angeles office of WWB-NY. Getz, with both

exceptional managerial ability and experience in industrial advertising, became a member of the board of directors of WWB-NY and executive vice president and manager of WWB-Cal. The acquisition of Getz solved the management problem of the west coast operations of WWB-NY. G&S had a net operating loss carry-forward in the amount of $58,644 at the time of its acquisition by WWB-NY.

Although the acquisition of G&S, basically an industrial shop, added more industrial advertising, it was management's belief (both WWB-Cal's and WWB-NY's) that that acquisition and the consolidation of the west coast operations did not help WWB-Cal to diversify and grow because of potential client conflict among industrial accounts or to obtain consumer accounts because of the lack of a record or any reputation for creativity in the consumer advertising field.

In 1965 Weir first contacted Hal Stebbins (hereinafter Stebbins) about acquisition of Hal Stebbins, Inc. (hereinafter HSI). Stebbins was the president and sole stockholder of HSI. Weir believed Stebbins and HSI would give WWB-Cal the creative strength and reputation it needed. Stebbins was a highly regarded creative man in the advertising field, the author of a number of articles, pamphlets, and books on advertising and a contributing editor to "Printers Inc.," an important trade magazine, from 1937 to 1967. Weir had known Stebbins for many years prior to 1965 and had on numerous occasions appeared on the same speaking platforms with him. Stebbins declined any acquisition at that point.

Having heard that HSI had lost some of its accounts and that Stebbins might be more amenable to an acquisition, Weir again approached Stebbins in December 1966 or January 1967 on the basis of Stebbins' age and desire to avoid the management side of the business and to devote his time to creative work. After discovering Stebbins' now willingness to consider an acquisition, Weir then assigned Getz to explore the situation and work out the details, including price, of an acquisition. At some time early in 1967, Weir and Stebbins reached agreement on the desirability of combining HSI and WWB-Cal. Weir did not have knowledge of HSI's net operating losses at the time he and Stebbins reached their agreement, but was informed of such losses prior to the completion of the acquisition on July 13, 1967. Weir, as president of WWB-NY, did not consider the tax ad-

vantages to be gained by the acquisition to be of any importance in his view of the transaction or in his decision to acquire HSI, and did not discuss tax considerations with the board of directors of WWB-NY. Weir, in fact, never discussed HSI's net operating losses with Stebbins, nor did he inspect the books and records of HSI.

Stebbins and Getz had many meetings, starting with one in January 1967 and a second in February 1967, to discuss the acquisition of HSI. At some time prior to March 15, 1967, Getz learned of the net operating losses of HSI. Getz requested, and received on March 17, 1967, a memorandum from an accounting firm which included, among the analysis of the financial aspects of several proposals regarding the HSI acquisition, an estimate of the tax savings to be derived by use of HSI's net operating loss carry-forward. In this memorandum, the tax benefit of the HSI carry-forward was estimated at up to $33,000, this figure being based on an approximated net operating loss carry-forward of $100,000 as of March 31, 1967.[4] No mention was made in this memorandum of the form of the acquisition necessary for survival of HSI's carry-forward.

Getz and Stebbins discussed, among other things, the compatibility of HSI and WWB-Cal, both as to personnel and as to lack of conflict among clients. Getz also met with Jack Whitehouse (hereinafter Whitehouse) and the other employees of HSI to become acquainted with them and to evaluate how the HSI staff fitted together. Getz believed that Whitehouse, who was director of the public relations function of HSI, was a critical party to the acquisition since his department was responsible for between 60 to 70 percent of the billing of HSI. Getz understood from his talks with Whitehouse that he (Whitehouse) was in favor of the acquisition. Weir also had no indication that Whitehouse would leave WWB-Cal after the acquisition.

The first draft by WWB-NY's attorneys of the proposed acquisition agreement, dated April 21, 1967, by its cover letter, states that the parties then contemplated that HSI would be operated as a wholly owned subsidiary of WWB-NY. A May 5, 1967, draft proposed that WWB-Cal acquire all the assets of HSI in return for WWB-NY stock. Until receipt of this May 5, 1967,

---

[4] It is unclear from the memorandum whether it was contemplated that HSI would continue in existence as a separate entity or would be combined with WWB-Cal in arriving at the amount of potential tax benefits.

draft, Stebbins' and his attorney's understanding of the transaction was that HSI would continue in existence for several years. In the above-mentioned drafts, it was also proposed that Stebbins would be repaid in full $20,000 previously lent by him to HSI. In a May 24, 1967, draft, Stebbins was to be repaid $30,000 [5] previously lent to HSI by him, and the acquisition was put in the form of a WWB-NY stock for HSI stock exchange with a simultaneous merger and liquidation of HSI into WWB-Cal. The acquisition agreement as executed provided that Stebbins would contribute to HSI's capital all amounts representing loans by him to HSI and provided that the form of the acquisition would be a WWB-NY stock for HSI stock exchange with a simultaneous merger and liquidation of HSI into WWB-Cal with closing on July 13, 1967.

Getz originally negotiated a deal wherein Stebbins would receive approximately $10,000 in WWB-NY stock for his HSI stock along with payment of loans made by him to HSI, but, after realizing that HSI's losses were greater than anticipated, Getz and Stebbins agreed in early June 1967 that Stebbins would not be repaid the loans he made to HSI. Around the middle of June 1967, Weir met with Stebbins and, after discussing the consideration Stebbins was to receive, unilaterally sought and received directors' approval to increase that consideration, which was in the form of WWB-NY stock, by approximately $10,000 worth of WWB-NY stock.

In an internal memorandum of WWB-NY's and WWB-Cal's attorneys, dated July 10, 1967, the terms of the HSI acquisition were described, and the qualification of the transaction as a nontaxable reorganization and the availability of the net operating loss carry-forward to WWB-Cal were discussed.

On or about July 13, 1967, WWB-Cal acquired all of the capital stock of HSI in exchange for 613 shares of the common stock of WWB-NY, of which 564 shares were delivered to Stebbins immediately and 49 shares that initially were placed in escrow were delivered to him on or about October 5, 1967. The assets and liabilities of HSI were transferred to WWB-Cal. For the purposes of this exchange, the WWB-NY shares had an agreed value of $36 per share on July 13, 1967, for a total value of $22,068. On July 13, 1967, Stebbins was 74 years old.

---

[5] The $10,000 increase between this and the earlier drafts resulted from the intervening discovery that Stebbins had lent HSI $30,000 rather than $20,000.

The assets, liabilities, and net worth of HSI on July 13, 1967, after Stebbins' contributions to HSI's capital of the $30,000 he lent it, pursuant to an unaudited financial statement, were as follows:

| | |
|---|---|
| Gross assets _____ | $33,227 |
| Liabilities _____ | 40,319 |
| Net worth _____ | (7,0[92]) |

Several years of the gross capitalized billings of WWB-Cal and HSI, rounded to the nearest $100,000, are shown in the following stipulated schedule:

| | HSI | WWB-Cal |
|---|---|---|
| 1965_____ | $1,600,000 | --- |
| 1966_____ | 1,100,000 | $2,300,000 |
| 1967_____ | 454,000 (to July 18, 1967) | 3,000,000 (includes HSI's billings after July 13, 1967) |

Gross capitalized billings, when multiplied by 15 percent, equal gross income to an agency. After HSI's assets were acquired by WWB-Cal, HSI's leased office premises were subleased by WWB-Cal and the HSI operations were moved into additional space at the WWB-Cal offices.

After HSI's assets were acquired by WWB-Cal, Stebbins became a vice president of WWB-Cal and was also a vice president of petitioner and its predecessors until his retirement on March 1, 1973. Stebbins remained actively employed by WWB-Cal and its successors until his retirement in 1973 at the age of 80 although, while coming to work every day, he did not put in full days for WWB-Cal or its successors after the July 13, 1967, acquisition. On November 23, 1972, the Los Angeles Advertising Association gave Stebbins its Distinguished Member Award. While Stebbins worked for WWB-Cal and its successors he handled his own group of accounts, and in fact brought in one small new account, did the contact, copy, and creative work on his accounts, and was available for creative consultation on other accounts. The compensation paid Stebbins for 4½ years before and 2½ years after the acquisition was as follows:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1963 _____ | $32,400.00 | 1/1/67 to 7/13/67 ___ | $3,000.00 |
| 1964 _____ | 30,000.00 | 7/13/67 to 12/31/67 _ | 11,356.63 |
| 1965 _____ | 23,500.00 | 1968 _____ | 17,500.00 |
| 1966 _____ | 25,000.00 | 1969 _____ | 8,958.43 |

In 1968, 1969, and afterwards, because of decreased billings on his accounts, Stebbins' compensation was reduced.

The personnel, other than Stebbins, of HSI as of July 13, 1967, their job classifications and salaries, and their employment history with WWB-Cal and its successors after July 13, 1967, were as follows:

| Name | Job classification | Salaries (annual rate) | Date of leaving employ of WWB-Cal or its successors |
|------|--------------------|-----------------------|------------------------------------------------------|
| Carolyn DeGregory_____ | Secretary to Stebbins | $6,000 | 8/31/67 |
| Norman Church _____ | Account executive | 15,000 | 10/26/67 |
| Jack Vibber _____ | Art director | 16,000 | 8/15/67 |
| Ruth Winberg _____ | Treasurer | 8,400 | 8/18/67 |
| Jack Whitehouse _____ | Public relations director | 16,000 | 5/31/68 |
| Don Caswell_____ | Public relations account executive | 13,000 | 5/31/68 |
| Tom Henley_____ | Public relations account executive | 10,000 | 5/31/68 |
| Gloria Croke _____ | Public relations secretary | 5,880 | 5/31/68 |

Carolyn DeGregory left WWB-Cal to work in Palm Springs. Norman Church accepted an offer to work for a smaller agency where he could become a principal. He took an account with him when he left. Jack Vibber moved over to another company where he became a part owner. Ruth Winberg retired when her husband retired.

Whitehouse, after first indicating he was in favor of the acquisition by WWB-Cal, left WWB-Cal to start his own agency shortly before MJA acquired WWB-NY by merger on June 28, 1968. Whitehouse wrote a letter to Getz, dated May 16, 1968, tendering his resignation and giving as the reason his desire to retain complete charge of his side of the business. Since MJA had a subsidiary which performed a public relations function, Whitehouse believed he would be put in a subordinate position after the WWB-NY merger with MJA. Getz attempted, but to no avail, to retain Whitehouse through talks between the latter and the head of MJA's public relations subsidiary to work out any conflicts. Don Caswell, Tom Henley, and Gloria Croke left with Whitehouse to become employed by his agency. Whitehouse took

the accounts he serviced with him. Weir and Getz first learned Whitehouse was contemplating leaving in April or May 1968.

As a result of the above departures, HSI's accounts which remained with WWB-Cal and its successors represented approximately 15 percent of HSI's billings as of July 1967 and were characterized as consumer-oriented accounts. These consumer accounts remained for the most part with WWB-Cal and its successors and were serviced by Stebbins.

The business reasons for the acquisition of HSI's assets and personnel by WWB-Cal include the following: the acquisition of the creative reputation of Stebbins and of a creative organization (including personnel) intact; the acquisition of and potential for development of consumer business; and the acquisition of additional billing and economies of operation. Weir and Getz believed that to be successful an advertising agency required growth, dynamism, and diversification. Such attributes, they thought, were acquired through the acquisition of agencies and accounts since that presents a successful image and in turn attracts business.

As of July 13, 1967, HSI had an unused net operating loss carry-forward of $127,132. On its Federal corporate income tax returns for its taxable year 1967 and its short taxable year January 1, 1968, to June 30, 1968, WWB-Cal deducted $16,124 and $41,011, respectively, of HSI's net operating loss carry-forward. On its Federal corporate income tax return for its taxable year 1968, MJA deducted $69,997 of HSI's net operating loss carry-forward. In his notices of deficiency in both dockets respondent disallowed the claimed net operating loss carry-forward deductions on the grounds of the applicability of section 269.

### OPINION

The sole issue for decision is whether the principal purpose motivating WWB-Cal's acquisition of the property of HSI was the evasion or avoidance of Federal income tax by securing a net operating loss carryover deduction not otherwise available, as the foregoing terms are used in section 269(a)(2),[6] with the result

---

[6] SEC. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX.

(a) IN GENERAL.—If—

* * *

    (2) any corporation acquires, or acquired on or after October 8, 1940, directly or indirectly, property of another corporation, not controlled, directly or indirectly, immediately before such acquisition, by such acquiring corporation or its stockholders, the

that the net operating loss carryover deductions of HSI are not allowable to WWB-Cal or to MJA (WWB-Cal's successor). We note initially that applicability of section 382 was not raised and that there is no denial by petitioner that the requirements for applicability of section 269(a)(2), other than the question of the principal purpose of the acquisition, were not met. Also, it has been stipulated that there is no issue taken with respect to MJA's motive in acquiring, by merger, WWB-NY and ultimately part of HSI's net operating loss carryover. The availability of HSI's net operating loss carryover to both WWB-Cal and MJA depends solely upon whether or not the principal purpose of the acquisition of HSI's assets was the evasion or avoidance of Federal income tax.

In order for section 269(a) to be applicable, the tax-evasion or -avoidance motive must be the principal purpose for the acquisition and to be so the evasion or avoidance purpose must outrank, or exceed in importance, any other one purpose. S. Rept. No. 627, 78th Cong., 1st Sess. (1943), 1944 C.B. 1017. *Commodores Point Terminal Corporation*, 11 T.C. 411, 416 (1948). The determination of the purpose of the acquisition presents a question of fact which must be resolved by considering all the facts and circumstances of the entire transaction with the burden of proof on petitioner. *Industrial Suppliers, Inc.*, 50 T.C. 635, 645-646 (1968).

Careful scrutiny of the entire record leads us to the conclusion that tax avoidance was not the principal purpose of the acquisition of HSI's assets and personnel. Instead, the record affirmatively establishes that the principal purpose of the acquisition was bona fide business considerations which are listed in our Findings of Fact. It is our opinion that the transaction consummated between WWB-Cal and HSI was not an arrangement which distorted or perverted deductions so that they no longer bore "a reasonable business relationship to the interests or enterprises which produced them and for the benefit of which

basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation,

and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then the Secretary or his delegate may disallow such deduction, credit, or other allowance. * * *

they were provided." See S. Rept. No. 627, 78th Cong., 1st Sess. (1943), 1944 C.B. 1016.

In a case such as this which necessarily requires delving into intent, we think the testimony of the acquiring corporation's top management is of particular importance. See *Vulcan Materials Co. v. United States*, 446 F.2d 690, 700 (C.A. 5, 1971), certiorari denied 404 U.S. 942 (1971); *Southern Dredging Corp.*, 54 T.C. 705, 718 (1970); *PEPI, Inc.*, 52 T.C. 854, 866-867 (1969), affd. 448 F. 2d 141 (C.A. 2, 1971).

In the instant case we think Walter Weir, who was president of WWB-NY (WWB-Cal's parent) at the time of the negotiations with Stebbins and the acquisition of HSI's assets and personnel in 1967, represented the acquiring corporation's top management who had control over the transaction in question. His testimony, which we find to be forthright and credible as to the motives behind the acquisition, in conjunction with other corroborating evidence contained in the record leads us to our conclusion that the principal purpose for the acquisition was not that which was interdicted under section 269 but instead was within the realm of prudent business judgment. Such testimony was effectively corroborated in part by the similar testimony of Getz, who was the manager of WWB-Cal, and Stebbins, who was president and sole stockholder of HSI and who remained with WWB-Cal and its successors for some 6 years after the acquisition. While each of these men may have placed differing values upon the business reasons for the acquisition listed in our Findings of Fact, we are compelled to the conclusion that business considerations principally motivated the acquisition. We also note, in weighing the testimony of Weir and Getz, that at the time of the hearing herein they were no longer employees of or stockholders in petitioner. Weir's testimony was also effectively corroborated by events leading up to and following the acquisition.

It was Weir's belief that to be successful an advertising agency requires growth, dynamism, and diversification. The method chosen for this expansion and diversification was by the acquisition route rather than by internal growth and the HSI transaction was only one of many in which WWB-Cal and WWB-NY and their predecessors and successors were involved. In particular the acquisition of HSI's assets and personnel was made to shore up deficiencies in the WWB-Cal operation. The fact that all the hoped-for results did not ensue does not negate the

existence of bona fide reasons, behind the decision of top management, to acquire HSI's assets and personnel in the first place. *Southern Dredging Corp., supra* at 719. See also *Zanesville Investment Co. v. Commissioner*, 335 F. 2d 507, 514 (C.A. 6, 1964), reversing and remanding 38 T.C. 406 (1962).

We think it essential in any inquiry into intent to examine all the events leading up to and following the acquisition. See S. Rept. No. 627, *supra*, 1944 C.B. 1017; *PEPI, Inc.*, 52 T.C. at 862, 865. In particular we are impressed by the fact that Weir contacted Stebbins in 1965 about acquisition of HSI but was turned down. This indicates to us that the 1967 acquisition was not an artifice but was undertaken for a real and substantial business purpose. When the entire series of events leading up to the actual acquisition in July of 1967 are considered, we think it clear that the desire of Weir to acquire was formed no later than early 1967 and that the decision was made without any weight given by Weir to the tax aspects of the transaction.

Respondent emphasizes the fact that within 1 year after the acquisition only a small percentage of HSI's accounts and billings remained with WWB-Cal. Undoubtedly hindsight is better than foresight but it is certainly not controlling in determination of the question herein. *Zanesville Investment Co. v. Commissioner*, 335 F. 2d at 514. In the instant case the departure of personnel and business taken by that personnel was unanticipated, unprovoked, and fully explained. Moreover, Hal Stebbins himself remained with WWB-Cal and its successors and performed services for them until his retirement in 1973. We do not think this to be a case where the business of HSI was purposely carried on just long enough to give an appearance of bona fides.

In order to show a predominant tax-avoidance purpose, respondent next stresses the facts that as of March 15, 1967, Getz knew of and had received an accountant's estimate of the potential tax benefits to be derived from HSI's net operating loss carryover, that the method of acquisition was changed from a B reorganization to a C reorganization in May 1967, and that the tax aspects of the net operating loss carry-forward were discussed in an attorney's internal memorandum dated July 10, 1967 (several days prior to the closing). It is clear, however, that consideration of the tax aspects of a transaction does not mandatorily require application of section 269 and that such consideration is only prudent business planning. *Vulcan Materials Co. v. United*

*States, supra* at 698; *Alcorn Wholesale Co.,* 16 T.C. 75, 89 (1951); *Berland's Inc. of South Bend,* 16 T.C. 182, 188 (1951); *Commodores Point Terminal Corporation, supra* at 418. While consideration of the tax factors in a transaction may create an unfavorable atmosphere in a taxpayer's attempt to avoid the consequences of section 269, it does not automatically follow that tax avoidance was the principal purpose of an acquisition. While Getz, and even Weir, knew of HSI's net operating loss carryover prior to the actual acquisition in July 1967, we believe that business necessity rather than tax avoidance was the dominating force behind the acquisition by WWB-Cal. It is clear to us that Weir's decision to acquire was not at all motivated by the net operating losses of HSI. We do not think it can be said from the facts of the instant case that any purpose of tax evasion or avoidance exceeded in importance any other purpose.

Of more difficulty in our conclusion in the instant case is the fact that the acquisition, as originally contemplated, apparently envisioned the continuation of HSI as a subsidiary of WWB-Cal through a B reorganization. The method of acquisition ultimately arrived at was an asset acquisition via a C reorganization. Respondent argues, on the basis of *Canaveral International Corp.,* 61 T.C. 520 (1974), that the change in form of acquisition, which technically allows WWB-Cal the use of HSI's net operating loss carryover,[7] requires application of section 269. In that case the taxpayer desired to acquire a yacht, Norango, Inc.'s principal tangible asset, but, after discovering the potential tax benefits involved, the taxpayer therein acquired the stock of Norango, Inc., instead. In that case we stated (at p. 541):

But when section 269 is placed in issue, it does require a showing that the most favorable tax route, *when that route involves the acquisition of a corporation,* was principally motivated by non-tax-related business reasons. [Emphasis supplied.]

It is clear that the above-quoted statement does not apply to the instant case because here we have the acquisition of assets, not the acquisition of a corporation. While there is a great deal of difference between acquiring one asset, the yacht in *Canaveral*

_____

[7] If the acquisition was by way of a B reorganization (i.e., where HSI continued as a subsidiary), sec. 381, which allows carryovers of certain corporate attributes to the acquiring corporation, would have been inapplicable. Furthermore, if WWB-Cal and HSI filed a consolidated return, sec. 1.1502-21(c), Income Tax Regs., would apparently apply to limit the use of HSI's net operating loss carryover to, basically, the income generated by HSI alone.

*International Corp., supra,* or the inventory in *Industrial Suppliers, Inc., supra,* and acquiring a corporation, we do not see so great a difference between acquiring a corporation's entire operation (i.e., acquisition of assets) as here, and acquiring the corporation itself. We do not think a change in form of acquisition from the acquisition of a corporation to the acquisition of a corporation's entire operation is so drastic to warrant a mandatory denial of the carryover of tax attributes.

In order to buttress his determination that the principal purpose of the acquisition of HSI's assets and personnel was tax avoidance respondent points to section 269(c).[8] We have previously stated that the relationship between the test provided in section 269(c) and tax-avoidance purposes is far from clear. That provision is merely a "procedural device" which accords further weight to the presumption of correctness already existing in respondent's determination by creating a rebuttable presumption of tax avoidance. *Glen Raven Mills, Inc.,* 59 T.C. 1, 16 (1972); *Baton Rouge Supply Co.,* 36 T.C. 1, 13 (1961). We do not think it necessary to consider whether the consideration paid in the instant case is "substantially disproportionate" since we are convinced that petitioner's proof meets any burden placed upon it by section 269(c).

*Decisions will be entered for the petitioner.*

---

[8] SEC. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX.

(c) PRESUMPTION IN CASE OF DISPROPORTIONATE PURCHASE PRICE.—The fact that the consideration paid upon an acquisition by any person or corporation described in subsection (a) is substantially disproportionate to the aggregate—

(1) of the adjusted basis of the property of the corporation (to the extent attributable to the interest acquired specified in paragraph (1) of subsection (a)), or of the property acquired specified in paragraph (2) of subsection (a); and

(2) of the tax benefits (to the extent not reflected in the adjusted basis of the property) not available to such person or corporation otherwise than as a result of such acquisition, shall be prima facie evidence of the principal purpose of evasion or avoidance of Federal income tax. This subsection shall apply only with respect to acquisitions after March 1, 1954.