STANGE CO., (Successor to GCO, Inc.), Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Stange Co. v. Commissioner
Docket No. 567-74.
United States Tax Court
T.C. Memo 1977-7; 1977 Tax Ct. Memo LEXIS 435; 36 T.C.M. (CCH) 31; T.C.M. (RIA) 770007; January 13, 1977, Filed Jack W. Hawkins and Bernard M. Stoller, for the petitioner. Kemble White and John Copeland, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in the Federal income tax of GCO, Inc. (formerly Media Graphics, Inc. *436 ) for the taxable years ending August 31, 1968, and August 30, 1969, of $23,937.69 and $43,211.89, respectively. Certain concessions have been made by petitioner, and as a result the only issue remaining for our consideration is whether petitioner was entitled to deduct certain net operating losses and investment credits carried over to and incurred in the taxable years ending on August 31, 1968, and August 30, 1969, which credits and losses were disallowed by respondent pursuant to section 269, I.R.C. 1954. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Stange Company is a corporation whose principal place of business at the time of filing the petition in this case was Chicago, Illinois. It is the successor in interest of the corporation which is the subject of the controversy here, GCO, Inc., formerly Media Graphics, Inc. (MGI). MGI filed Federal income tax returns for its taxable years ending August 31, 1968, and August 30, 1969, with the District Director, Internal Revenue Service in Dallas, *437 Texas. [2]
The controversy here principally involves transactions relating to two corporations, Media Graphics, Inc. (MGI) and April Corporation (April). The following table shows the various names of Media Graphics, Inc. and the periods during which these names were used. For simplicity, regardless *438 of the time frame involved, this corporation will be referred to hereafter as MGI. Name
Period
Robert Snyder, Brice, Young
& Associates, Inc.
8/28/63 - 1965
Brice-Young & Associates, Inc.
1965 - 2/16/68
Media Graphics, Inc.
2/16/68 - 6/4/69
GCO, Inc.
6/4/69 -
GCO, Inc. was later merged into Stange Company along with April and its other subsidiaries. MGI was incorporated under the laws of Texas on August 28, 1963. Its business was commercial photography, especially photography used in the production of sales catalogues for retail merchandisers. Initially, its stock was owned in equal shares by Paul Young and Charles Brice. However, in December of 1965 G.F. DeCoursin, Mack Duce, and Norris Adams each purchased substantial amounts of MGI stock, and by December of 1967 they had acquired 51 percent of the stock. By December of 1965, MGI had accumulated a substantial earnings deficit. It was having difficulty meeting its current obligations to employees and suppliers and had incurred substantial debts. Messrs. DeCoursin, Duce and Adams caused MGI to improve its management and to hire a consultant, Maurice Ash, who prepared a report dated August 25, 1967, recommending *439 various management reforms. This report noted four alternative courses of action, bankruptcy, liquidation, sale of the business, and internal reorganization, and recommended the last. Mr. Ash felt that the business showed a good opportunity for profit if it were properly managed. On April 13, 1966, Deharduc, Inc., a Texas corporation, was organized. Its name was changed on April 26, 1966, to April Corporation. Until the acquisition of MGI by April in May of 1968, April had outstanding 10,000 shares, owned equally by G.F. DeCoursin and Mack Duce. April was formed to acquire the assets of a bankrupt corporation, Jem Foods, which had been in the business of blending doughnut and pancake mixes and other dried products principally for distribution in Texas. One of its customers was Kentucky Fried Chicken (KFC) for whom it blended fried chicken batter. Shortly after the acquisition of Jem's assets, April discontinued its unprofitable lines of business and eventually limited its activities solely to blending KFC's seasoned flour for national distribution. In developing this business with KFC, April acquired warehouses and developed packaging techniques and a nationwide distribution *440 system. It continued operations with KFC as its only customer until May of 1968, the date of the acquisition here in issue. April's working arrangement with KFC consisted only of a short-term commitment for April's product. KFC periodically ordered varying quantities of mixed flour. This flour was then produced and shipped to April's warehouses.From there it was distributed on a daily basis on instructions from KFC. There was usually no more than a 30-day supply kept in the warehouses. After its organization, April's management was concerned continuously about its relationship with KFC, its sole customer. KFC was engaged in rapid expansion, and the personnel with whom April's employees dealt were often changing. There were occasional complaints from KFC's franchisees about product quality and the use of April's pre-mixed flour, rather than using flour mixed themselves. April's management was also concerned with the financial security of KFC. Other franchise fried chicken restaurant chains had bankrupted, and some of KFC's diversification activities were regarded as questionable. KFC frequently studied the feasibility of blending its flour itself. Furthermore, KFC often *441 indicated a desire to acquire April's flour blending business and at times entered negotiations toward this end from 1967 to 1970. KFC's interest was limited to the flour blending division, however, and did not extend to the other activities in which April's subsidiaries engaged after May of 1968. In early April of 1968, the management of April and MGI evidenced an interest in reorganizing and consolidating the businesses of the two corporations. Norris Adams, secretary-treasurer of both April and MGI, met with Dan Morrison and Harvey Brown, accountants from Arthur Andersen & Co., on April 4, 1968, to discuss a proposed merger between the two entities. The accountants suggested that to preserve MGI's net operating loss carryovers of about $90,000 April should merge into MGI with April's shareholders exchanging their stock for MGI common stock. Mr. Adams later met separately with the accountants and with Cecil Magee, an attorney, on April 18, 1968. With Messrs. Morrison and Brown, he discussed accounting and auditing aspects of various forms of reorganization. The conferees designed a reverse stock split to remedy certain of these problems. With the attorney, Mr. Adams discussed *442 other problems and methods of reorganization. On April 19, 1968, the accountants, the attorney, and Messrs. Adams, DeCoursin and Duce met to discuss the results of Mr. Adams' meetings. A tentative plan of reorganization and a schedule of action were prepared. The form of reorganization suggested by the accountants was the creation of a holding company (April) owning all the stock of an operating company (MGI) which would operate the businesses formerly owned by April and MGI separately. This configuration would be achieved by an exchange by MGI shareholders of MGI stock for April stock. April would then transfer its assets and liabilities to MGI, either as a capital contribution or in exchange for additional MGI stock. On April 22, 1968, the attorney and the accountants discussed the conversion ratio appropriate for the exchange of MGI stock for April stock.They decided that MGI would first have a 1-for-10 reverse stock split, then April would exchange one share of its stock for four of MGI. April then had 10,000 shares outstanding, and 2,000 more were to be issued in the exchange. In connection with the reorganization and because of MGI's poor financial condition, Mr. DeCoursin *443 obtained a commitment for additional investment from H.N. Carr, and MGI stockholder, on April 22, 1968. He also negotiated with representatives of an MGI creditor, American Graphics Corporation, for a settlement of all its claims against MGI totaling $55,000 for $18,500 payable within 30 days of the agreement. The $18,500 was paid by check on May 6, 1968. In a notice dated April 30, 1968, the directors and shareholders of MGI were informed of meetings to be held consecutively on May 13, 1968. Enclosed with each notice was a form for subscription for additional MGI stock and a memorandum describing the proposed reorganization, including certain preliminary steps. [3] On that same date, Mr. Morrison mailed to Mr. DeCoursin a memorandum describing the capital structure of April and MGI, reasons for the reorganization [4] and steps to be taken. *444 On May 13, 1968, the directors and shareholders of both April [5] and MGI[6] met and adopted the proposed reorganization plan. [7] Pursuant to this plan: (1) Any MGI shareholders were allowed to subscribe for additional MGI stock not exceeding two shares for each share already owned at a price of $1 per share. Under this authority the following persons subscribed and paid for additional stock: No. of
Date Subscriber
Shares
Subscribed
Date Paid
Date Issued [1]
Mack Duce
16,800
May 3, 1968
June 4, 1968
June 3, 1968
Hal Carr
20,000
May 9, 1968
June 10, 1968
June 10, 1968
Maurice Ash
4,000
May 11, 1968
June 13, 1968
June 14, 1968
G.F. DeCoursin
1,800
May 13, 1968
May 14, 1968
June 14, 1968
(2) Paul Young, an MGI stockholder who did not want to participate in the plan, received $3,900 on May 31, 1968, in redemption of his 3,900 shares of MGI stock. (3) The capital structure of MGI was changed. The authorized capital stock was reduced from 250,000 *445 to 25,000 shares, and all outstanding shares were exchanged for new shares in the ratio of one new share for ten old shares. The number of shares committed to both options and subscriptions were concomitantly reduced on the same ratio and the purchase price increased by a factor of ten. MGI also reduced its stated capital proportionately and eliminated shareholders' preemptive rights. (4) April's capital structure was changed from one class of common stock to two classes having the same rights and characteristics except for voting rights. The Class A stock, to be received by prior April stockholders, had one vote per share. The Class B stock, to be received by former MGI stockholders, had 30 votes per share. This amendment of April's Articles of Incorporation was filed with the Secretary of State of Texas on May 6, 1968, and was approved by the directors and shareholders on May 13, 1968. (5) The shareholders of MGI exchanged their stock with April for April Class B stock; 4 MGI shares were exchanged for each April share received. [8] Initial exchanges of stock certificates were made on May 24, 1968, by the following persons in the stated amounts: No. of MGI
No. of April
Shares
Class B Shares Transferor
Surrendered
Received
Charles H. Brice
390
97.5
Norris Adams
340
85
Aladdin Beauty Col-
leges, Inc.
200
50
Maurice Ash
1,000
250
H.N. Carr
1,000
250
G.F. DeCoursin
2,340
585
Mack Duce
840
210
Total
6,110
1,527.5
*446 April was issued a certificate for the 6,110 shares of MGI stock on May 24, 1968. Subsequent exchanges were made of MGI shares previously subscribed and issued after May 24, 1968, as follows: No. of
No. of April
Shares
Date
Date
Class B Shares Transferor
Subscribed [1]
Issued
Exchanged
Received
Mack Duce
16,800
June 3, 1968
June 10, 1968
420
H.N. Carr
20,000
June 10, 1968
June 10, 1968
500
Maurice Ash
4,000
June 14, 1968
June 14, 1968
100
G.F. DeCoursin
1,800
June 14, 1968
June 14, 1968
45
Total
42,600
1,065 After these exchanges were completed, April had outstanding 10,000 Class A shares, which had one vote per share, and 2,592.5 Class B shares, which had 30 votes per share.
(6) April transferred its assets and liabilities to MGI.The plan as proposed by the accountants and as adopted by both April and MGI contemplated that April would make this transfer simultaneously with the stock exchange. [9] Assets with a book value of $155,909.11 were transferred onto the books of MGI under date of *447 May 18, 1968, although the entry itself was made some time in June of 1968. This date was selected by the board of directors as the effective date of the reorganization because it ended a four-week fiscal period of MGI. The book entry was intended to conform to the reorganization plan as approved by the directors. On May 21, 1968, April delivered a check for $45,000 to MGI, and this amount was entered on MGI's books. The amounts of these two entries exceeded the total book value of April's assets on May 18, 1968, by $18,508.82. *448 After the reorganization of April and MGI, administrative services of both corporations were consolidated and the administrative staff of twelve was cut by three or four persons. On June 6, 1968, Mr. DeCoursin and Cecil Magee met with Dan Morrison of Arthur Andersen & Co. in connection with a possible exchange of the flour division with KFC for KFC stock. They discussed alternative methods of exchange. Two of the four alternatives, including the one they considered to be the best, expressly contemplated utilization of MGI's net operating loss to offset part of any gain recognized in the transaction. On December 11, 1969, MGI was again considering an exchange of the flour division for KFC stock. At a special meeting, the board of directors approved Mr. DeCoursin's negotiations to improve KFC's offer and instructed management to "investigate the possibility of disposing of the studio division and seek an offer therefor." In 1969, April formed a new subsidiary to acquire the assets of a company that manufactured refrigeration equipment for trucks. The new subsidiary was operated under the name of Temp Con Corporation. In 1970, April formed another subsidiary, Texas April, *449 to operate in the chemical cleaning business. Both subsidiaries were still operating at the time of the trial in this case. [10] The April management investigated several other diverse businesses as possibilities for acquisition during this period. April Corporation had the following earnings history during the 3 years in which it was an operating company. Period Ending
Earnings (Loss)
December 31, 1966 (Operations
began April 13, 1966)
($13,884.89)
December 31, 1967
47,111.94
December 31, 1968
43,724.08 By April 20, 1968, it had accumulated $24,061.23 in net income for its current fiscal year before Federal income taxes, and by May 18, 1968, the figure had increased to $29,241.36. Media Graphics, Inc. reported the following earnings during the years prior to its consolidation with *450 April: Period Ending
Earnings (Loss)
August 31, 1964
($54,060.38)
August 31, 1965
( 46,125.43)
August 31, 1966
12,132.71
August 31, 1967
2,948.85 Thus, MGI reported a net operating loss carryover to its fiscal year ending August 31, 1968, of $85,104.25. This carryover was only partially offset by income during that period. MGI reported a net operating loss carryover to its fiscal year ending August 30, 1969, of $68,985.68 after a reduction of $11,472.47 for income not previously reported. MGI reported a carryover of unused investment credit for its fiscal year ending August 31, 1968, of $5,252.41. This carryover was not used in that year and was reported as a carryover in its fiscal year ending August 30, 1969. MGI experienced a taxable loss for the period from September 1, 1967, to May 18, 1968, of $16,150. On May 18, 1968, the assets and liabilities of April were transferred from April to MGI on their books, and thereafter accounting for the operations previously owned by April was made as a division of MGI. For simplicity, this division will hereafter be referred to as the flour division and MGI's prior operations will be referred to as the studio *451 division. MGI as a whole was continuously profitable after the reorganization. However, the studio division, the operations of which produced the losses here in issue, continued after the consolidation to produce losses in its normal operations for the remainder of MGI's fiscal year ending August 31, 1968, and for its fiscal year ending August 30, 1969. These losses totaled $29,121 and $20,559.35, respectively, before Federal income taxes.After this point, however, the studio division began profitable operations. It produced net income for the remainder of the calendar year 1969 and throughout the calendar years 1970, 1971, 1972 and 1973. [11] In 1974 its operations were split into two divisions, and their combined operations produced a net loss before taxes of $87,458.92. But during the first 10 months of 1975 the operations had net income before taxes of $5,647. The studio division has also grown substantially in sales volume from a yearly rate of about $300,000 at the time of the reorganization to over $1,000,000 in 1975, considering both its eastern and western operations. *452 On its Federal income tax return for its fiscal year ending August 31, 1968, MGI reported a net operating loss carryover of $85,104.25 and deducted $4,646.18 of this net operating loss to offset taxable income in this amount reported before net operating loss deduction and experienced losses from its studio division operations reducing taxable income by $16,150, attributable to the period from September 1, 1967, to May 18, 1968, and by $29,121, attributable to the period from May 19, 1968, to August 31, 1968. It reported an unused investment credit carryover from prior years of $5,252.41 and a current tentative credit of $673.90. On its Federal income tax return for its fiscal year ending August 31, 1969, MGI deducted from reported income of $274,985.62 prior to net operating loss deduction a net operating loss carried over from prior years of $68,985.68. It also reported and applied an investment credit carryover from prior years of $5,926.31 and a current investment credit of $590.61. Respondent in his notice of deficiency disallowed the above net operating loss deductions and increased taxable income by the amount of the studio division losses during both portions of the *453 fiscal year ending August 31, 1968. Respondent allowed an investment credit for the year ending August 31, 1968, of $432.08 calculated only on property acquired by the flour division "after the transfer of April's business to" MGI. An investment credit was also allowed for the year ending August 30, 1969, of $590.61, the credit calculated on property acquired during that year only. The reported investment credit carryover of $5,926.31 was disallowed. Respondent explained these adjustments as follows: It is determined that the principal purpose for April Corporation's acquisition of control of GCO, Inc. (formerly Media Graphics, Inc.) and the transfer of its business to GCO, Inc., on May 18, 1968, was to gain the benefit of Media Graphics' net operating losses and investment credit carryovers, as well as to obtain the use of the current operating loss of $45,005.30 being incurred by Media Graphics, Inc., at the time of the transfer, thus avoiding payment of federal income taxes.
OPINION This controversy has its origin in the transactions of two corporations, April and MGI. MGI had experienced net operating losses and unused investment credits which were carried over to the *454 years in issue and was anticipating current net operating losses. April was a profitable corporation and contemplated future earnings.Prior to May of 1968, April was controlled, within the definition of section 269, by Mr. DeCoursin and Mr. Duce; they also owned a minority interest in MGI. On May 14, 1968, Mr. DeCoursin purchased additional stock giving him and Mr. Duce control of MGI within the definition of section 269. Thereafter, April acquired all the stock of MGI from Mr. DeCoursin, Mr. Duce and others in exchange for April stock, and April's assets were transferred to MGI. Respondent has disallowed to MGI certain deductions and credits pursuant to section 269(a) based on the acquisition of MGI stock by April and the acquisition of April's assets by MGI. Section 269(a) provides: SEC. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX. (a) In General.--If- (1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, or (2) any corporation acquires, or acquired on or after October 8, 1940, directly or indirectly, *455 property of another corporation, not controlled, directly or indirectly, immediately before such acquisition, by such acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation, and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then the Secretary or his delegate may disallow such deduction, credit or other allowance. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation. Petitioner asserts that the acquisition of all MGI stock by April was not an acquisition described in section 269(a)(1) and that the receipt of April's assets by MGI was not an acquisition described in section 269(a)(2). These acquisitions are further argued by petitioner *456 to have been made for a purpose other than that prohibited by section 269(a). Respondent disputes each of these contentions. For the reasons discussed below, we find that the acquisitions of MGI stock by April and of April's assets by MGI did not have as their principal purpose the evasion or avoidance of Federal income tax, and we therefore hold for petitioner. In so holding, we do not reach the alternative arguments of petitioner that neither of these acquisitions meets the requirements of section 269(a)(1) or (2). In our view the evidence is clear that the acquisition by April of control of MGI and the acquisition by MGI of April's assets were steps contemplated and taken as integral parts of a single plan of action adopted by the common owners of the two corporations. The minutes of the meetings of MGI and April shareholders and directors held on May 13, 1968, and the related evidence show this to be the case. Thus, while either acquisition might arguably satisfy the threshold requirements of section 269(a)(1) and (2), we may look to the purposes of the overall plan to determine the principal purpose for both acquisitions. If that purpose is not to evade or avoid Federal *457 income tax, then section 269 does not authorize respondent's disallowance of deductions and credits in this case.
For tax evasion or avoidance to be the principal purpose for an acquisition under section 269, it must be the purpose that "outranks, or exceeds in importance, any other one purpose." S. Rept. No. 627, 78th Cong., 1st Sess. (1943), 1944 C.B. 973. See also D'Arcy-MacManus & Masius, Inc.,63 T.C. 440, 449 (1975). The determination of the purposes of the acquisitions here in issue must be made by an examination of all events surrounding the transactions and all facts shown by the record. See J. T. Slocomb Co.,38 T.C. 752, 764 (1962), affd. 334 F.2d 269 (2d Cir. 1964). Petitioner has asserted several purposes which it claims have motivated the acquisitions here. These asserted purposes predictably do not include tax avoidance. They include: (1) Supplying capital to MGI; (2) providing economy in administration of the two business entities; (3) providing diversity of investment; and (4) creating a vehicle *458 for future business acquisitions and diversification. First, petitioner contends that MGI's need for capital required the combination of April and MGI assets in one corporate vehicle. The record shows that MGI was having difficulty obtaining cash to pay employees and suppliers. It had borrowed heavily, and its credit was poor. Furthermore, it needed additional funds to improve its physicial plant. Petitioner's witnesses testified, however, that although the corporation had serious financial troubles its economic potential and prospects were good. Petitioner contends that the reorganization was designed to enable MGI to develop its potential by allowing it free access to cash from April's operations. [12]
Our examination convinces us that MGI did *459 in fact have a significant need for additional funds. Respondent, however, argues that this need could have been satisfied by intercorporate loans. While loans could have supplied cash for some period, the attendant obligation to repay reduces the desirability of this remedy. Certainly, choice of an arrangement providing a permanent infusion of capital to MGI is within the scope of sound business judgment. We find that petitioner's asserted purpose was a legitimate and significant purpose for the acquisitions. Our conclusion is reinforced by the undisputed fact that after the reorganization the MGI studio division eventually became a profitable operation, contributing significantly to the financial strength of the April group. Petitioner also contends that economy was gained by consolidation of the administrative functions of the two corporations. The record shows that the bookkeeping and payroll functions were consolidated and that three or four employees were eliminated from a combined staff of twelve as a result of the reorganization. Respondent argues that this economy could have been approximated by intercorporate arrangements for sharing of employees and office space. *460 While such an arrangement might lead to some economy, we are convinced that in this case the degree of savings was significantly greater in the wholly consolidated operation. We also find that petitioner intended to achieve these savings as one result of the reorganization. As a third business purpose for the acquisitions, petitioner contends that the owners of April sought to diversify their investment. It notes that the continued success of April was dependent upon maintaining its KFC business and upon KFC's own financial health. Diversification is argued to have provided more security for April stockholders and a corporation more attractive to investors.
We do not doubt that the owners of April felt insecure in their total dependence upon KFC.However, we can discern no improvement in their condition after the reorganization. April's owners had been substantial stockholders in MGI since December of 1965 and at the time of the acquisitions here they controlled MGI. In this position their investment was as diversified as it could be after the acquisitions.The reorganization did not alter the risk April assumed in its relationship with KFC, nor did it provide any alternative *461 use for April's assets if the KFC business were lost. Diversification might have made April more attractive to investors, but petitioner has presented no convincing evidence that this was the case. For these reasons, we conclude that petitioner has failed to show that diversification of investment was a significant purpose of the questioned acquisitions. Finally, petitioner argues that a major purpose of the acquisitions was to provide a corporate structure adaptable to future corporate acquisitions. The record shows that the original owners and managers of April planned, even before the formation of April, to acquire a number of businesses within a corporate structure and eventually to make a public offering of stock. From 1965 to 1970, they did in fact make four such acquisitions, beginning with April and MGI. Petitioner's witnesses testified that the reorganization of April and MGI into holding and operating companies, respectively, was intended to, and in fact did, facilitate the later acquisitions. We find that this asserted purpose was a legitimate and significant purpose for the acquisitions in issue. The testimony of petitioner's witnesses in this regard is buttressed *462 by the subsequent acquisitions that occurred and by consistent statements in contemporary documents. Respondent argues that combination of both business operations in one corporation unduly subjected the assets of one to the business risks of the other and that petitioner's contention cannot be believed. However, we consider the assumption of this risk by the April and MGI owners to be easily justified based on their assessment of the alternatives and their business judgment. We do not agree that use of this corporate configuration was inconsistent with the stated objectives. Though petitioner argues otherwise, we also find that one other purpose of the acquisitions in the instant case was to obtain the Federal income tax benefit resulting from the use of MGI's net operating loss carryover and investment credit carryover to reduce earnings of the flour division. It is apparent that these carryovers would have been of no benefit had income-producing assets not been aligned in some way with the loss-producing corporation. In initial discussions with their accountants, the April and MGI managers were informed of methods of reorganization that would preserve the carryovers.Both *463 Mr. DeCoursin and Mr. Adams testified that they were aware of the tax benefits of the acquisitions, and each had some idea of the level of tax savings. These facts alone do not establish tax avoidance as the principal purpose of the acquisitions, however. It is well established that the consideration of tax consequences is to be expected of any prudent businessman and that such consideration does not mandatorily require application of section 269. D'Arcy-MacManus & Masius, Inc.,supra at 451; Berland's Inc. of South Bend,16 T.C. 182, 188 (1951). However, the magnitude of the recognized tax saving does have a bearing on its importance. In this case, the evidence shows that the tax saving gained by the reorganization was approximately $50,000. [13]
*464 As discussed above, there were several purposes for the acquisition of MGI stock by April and for the acquisition of April's assets by MGI. We have carefully considered the relative importance of these purposes to the April and MGI directors and shareholders at the time of the acquisitions. Mr. DeCoursin and Mr. Adams testified that the tax benefits were of little significance in their decisions. Respondent argues that the magnitude of the tax saving involved dictates a different conclusion. From a consideration of the entire record, we find that tax avoidance, while one purpose, did not exceed in importance any one of the other purposes for which the acquisitions in question were made. Consequently, the acquisitions did not have as their principal purpose the evasion or avoidance of Federal income tax and therefore respondent erred in disallowing the questioned deductions and credits under section 269. Because of concessions made by petitioner, Decision will be entered under Rule 155. Footnotes
1. All section references herein are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. Paragraph 1 of the petition which is admitted in the answer states as follows: 1. The Petitioner is a corporation with its principal place of business in Chicago, Illinois. Its mailing address is 342 North Western Avenue, Chicago, Illinois 60612.The returns for the periods here involved were filed by Media Graphics, Inc., with the office of the Internal Revenue Service in Dallas, Texas. After filing such returns, Media Graphics, Inc., changed its name to GCO, Inc. Subsequent to the change of name, GCO, Inc., was merged into April Corporation. In April, 1970, April Corporation merged into Stange-April Corporation. Stange-April Corporation was subsequently merged into Stange Co., the Petitioner herein. The notice of deficiency which was mailed on November 1, 1973, was addressed as follows: GCO, Inc. (Formerly Media Graphics, Inc.) 1191 Empire Central Dallas, Texas 75247↩
3. The memorandum began with the following paragraph: As you no doubt are aware, this company has been and is in dire need of additional operating capital to orderly retire its obligations and realize the potential that it should have available. To attract new investment by the present shareholders, the officers have found that something had to be done about reducing the debt structure and completely revamping the capital structure. The need for diversification became apparent. A substantial "shot in the arm" appeared to be the only solution so that the above problems could be solved and the company could be put on a sound basis for expansion of its business and the obtaining of such bank credit as might be needed.
With the above problems in mind the officers, directors and many of the shareholders have diligently explored the various alternatives which might be available, and the following proposals are the result of their combined effort and thinking. It described the results to be accomplished as follows: If the foregoing is carried through to the ultimate conclusion, Media Graphics, Inc., would become a wholly owned subsidiary of April Corporation, and it is contemplated that April Corporation would contribute its operation to the capital of Media Graphics, Inc., thereby making Media Graphics, Inc., the operating company. The operating company would thus have more than one product line, needed working capital and credit for expansion would be available, and the shareholders would have a corporate vehicle that is adaptable to future acquisitions for further diversification. ↩
4. This memorandum recited: Media-Graphics and April desire to enter into a reorganization for the following reasons: 1. April is a single product line company with only one customer.Its shareholders would like some diversification. 2. Media-Graphics is strapped for cash. Although the company has "turned the corner" and is showing a profit, it needs working capital. 3. The shareholders would like to provide a vehicle for future acquisitions. Management is aggressive and would like to acquire other companies in the future.↩
5. On May 13, 1968, the directors of April were G.F. DeCoursin, Mack Duce, and Norris Adams.G.F. DeCoursin was president and Norris Adams was secretarytreasurer. Norris Adams resigned on May 13, 1968, and three additional directors were appointed, Maurice Ash, H.N. Carr, and Cecil Magee. ↩
6. The shareholders of MGI on May 13, 1968, were: Name of Holder and Date of Issue
No. of Shares
Charles H. Brice - 12/23/65
3,900
Paul Young - 12/23/65
3,900
G.F. DeCoursin - 12/23/65
3,400
Norris Adams - 12/23/65
3,400
Mack Duce - 12/23/65
3,400
G.F. DeCoursin - 1/4/67
10,000
H.N. Carr - 2/2/67
10,000
Aladdin Beauty Colleges - 5/29/67
2,000
G.F. DeCoursin - 11/3/67
10,000
Mack Duce - 11/3/67
5,000
Maurice Ash - 12/4/67
10,000
Total
65,000
On May 13, 1968, the directors of MGI were G.F. DeCoursin, Norris Adams, Mack Duce, H.N. Carr, Charles Brice, Maurice Ash, and Cecil Magee. G.F. DeCoursin was chairman and chief executive officer, Charles Brice was president, and Norris Adams was secretary-treasurer.↩
7. The minutes of the meeting of the Board of Directors of April recited: The president pointed out the necessity and desirability of April Corporation diversifying to avoid the pitfalls involved in its present one product, one customer operation; that a program was proposed whereby the shareholders of Media Graphics, Inc. would exchange their shares for Class B shares of April Corporation * * *. The president pointed out further that after such exchange of stock, Media Graphics, Inc. would become the wholly owned subsidiary of April Corporation, and that April Corporation could then channel its operations into Media Graphics, Inc., as the operating company thereby combining many of the functions into one operation which are now being handled by two operations, and that such combination should result in a substantial saving in overhead and fixed operating costs. The president pointed out that after the foregoing program is put into effect, the corporate arrangement would be such that would be adaptable to future acquisitions for purposes of further diversification. ↩
1. Some MGI shares were issued in the reduced amounts provided for in plan provision (3) below. All shares were then exchanged for April stock pursuant to plan provision (5) below.↩
8. At the time of the exchange, after the change in MGI's capital structure and the elimination of the stock of Paul Young which was to be redeemed, there were outstanding 6,110 shares of MGI, 4,260 shares were subscribed as described in plan provision (1) above, and 5,000 shares were committed to options, 2000 to Mr. DeCoursin, 2,000 to Mr. Ash, and 1,000 to Mr. Duce. ↩
1. The changes in capital structure of MGI caused the number of shares issued to be only one-tenth of these figures.↩
9. Thus, the proposal adopted by the MGI directors and shareholders stated "[if] the foregoing is carried through to the ultimate conclusion, Media Graphics, Inc., would become a wholly owned subsidiary of April Corporation, and it is contemplated that April Corporation would contribute its operation to the capital of Media Graphics, Inc., thereby making Media Graphics, Inc., the operating company." The "foregoing" included "Proposal No. Three" which provided "[that] after the capital reduction has been accomplished as aforesaid, the shareholders of Media Graphics, Inc., then exchange their shares for new Class 'B' shares to be issued by April Corporation on the basis of four shares of Media Graphics, Inc., for one share of April Corporation Class 'B' stock." The proposal adopted by the April shareholders provided: Be it further RESOLVED, that the officers of this corporation be and they are hereby authorized to proceed with carrying out the program, at such time, and in such manner, and upon such terms and conditions as they may deem appropriate, whereby afterMedia Graphics, Inc. becomes a subsidiary of April Corporation, the assets, liabilities, contracts, and choses of action, and the general operations of April Corporation are transferred to Media Graphics, Inc., and Media Graphics, Inc. to then become the operating company. [Emphasis added.] Finally, the proposal submitted by the accountants to the management of MGI and April provided: 4. The Media-Graphics shareholders will exchange their Media-Graphics stock for a new issue of April voting stock (B stock) on a ratio of 1 share of April for each 4 shares of Media-Graphics. These shares of April B stock will be identical in all respects with the present outstanding April stock except it will have 30 votes per share instead of 1 vote per share. 5. After step 4, April will own substantially all of the outstanding stock of Media-Graphics. April will then↩ make a capital contribution of all its assets and liabilities (except for its Media-Graphics stock) to Media-Graphics. [Emphasis added.]
10. While the record is incomplete with respect to these subsidiaries, it appears that Texas April experienced for calendar years 1971, 1972 and 1973 a $27,814.12 net loss before taxes, a $651.12 net loss before taxes, and $24,292.96 in net income before taxes, respectively. Temp Con had net income before taxes of $64,606 for the 11 months ending November 30, 1972.↩
11. The amounts of this income before taxes were $7,204.70 (approximately), $12,842.74, $94,567.01, $161,896.46 and $56,429.23, respectively.↩
12. Petitioner also argued that MGI would gain additional borrowing power latent in April's assets. While additional borrowing power may have been contemplated by the MGI and April management, the record indicates that no significant amount of debt was incurred after the reorganization.Failure to use any borrowing power contributed by April's assets undercuts the importance of such a contribution as a purpose for acquisition.↩
13. Respondent would have us compare this saving to the combined book value of April and MGI in May of 1968, approximately $337,170.08, and conclude that its magnitude mandates that it be the principal purpose for the acquisitions. We do not agree. Any such consideration could be only one of many factors; it does not conclusively establish its importance.↩